EL PUEBLO DE PUERTO RICO, demandante y recurrido, *v.* MARTÍN CARO GONZÁLEZ, acusado y recurrente.

*Número:* O-80-126      *Resuelto:* 24 de diciembre de 1980

*José Raúl Méndez Marrero*, abogado del recurrente; *Héctor A. Colón Cruz, Procurador General*, y *Lirio Bernal de González, Procuradora General Auxiliar*, abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Contestamos el enigma jurídico pospuesto hace casi medio siglo en *Pueblo* v. *Matos*, 43 D.P.R. 411 (1932), a saber, si a un policía se le puede alterar la paz, según lo dispuesto por el Art. 260 del Código Penal en su inciso (a).[1]

---

[1] En lo pertinente reza:

"Será sancionada con pena de reclusión que no excederá de seis (6) meses o multa que no excederá de quinientos dólares o ambas penas a discreción del Tribunal toda persona que voluntariamente realizare cualesquiera de los siguientes actos:

"(a) Perturbare la paz o tranquilidad de algún individuo o vecindario,

Esta interrogante se plantea con respecto a los policías Manuel Morales y José A. Vega. Éstos se personaron a la residencia del apelante, Martín Caro González, durante horas de la noche del 30 de mayo de 1979, ubicada en la Urbanización Isabel la Católica, Aguada, P.R., respondiendo a una querella de la esposa de Caro debida a desavenencias conyugales.

Al arribar al lugar de los hechos, el agente Morales miró por una de las ventanas del hogar en cuestión percibiendo al apelante Caro, quien se encontraba escuchando un componente en alta voz. Infructuosamente lo llamó en dos ocasiones. Los agentes optaron por requerir la presencia del Sargento Roldán. Volvieron a tocar la puerta, esta vez fuertemente. Al acusado darse cuenta de la presencia de la Policía dijo, entre otras cosas: "La policía que se vaya al c . . . jo, ustedes son unos p . . . . jos. Suban arriba, que les voy a entrar a palos". Coetáneamente daba cantazos con el palo de una escoba.

Las palabras expuestas "ofendieron" al agente Morales, quien, en diez y nueve (19) años en la Policía, nunca había sido objeto de tal insulto. No hubo contacto físico con los policías; éstos no lograron entrar a la residencia, ni el apelante salió de la misma.

El peticionario, Caro González, fue acusado, encontrado culpable y sentenciado en el Tribunal de Distrito, Sala de Aguada, con una multa de $100.00. El Tribunal Superior confirmó dicho dictamen.

I

Los hechos así delimitados por el crisol de los procedimientos en alzada, nos colocan en la particular perspectiva de la utilización de lenguaje abusivo o insultante por parte de

con fuertes e inusitados gritos, conducta tumultuosa u ofensiva o amenazas, vituperios, riñas, desafíos o provocaciones. . . ."

una persona hacia otra, o sea, en la relación básica entre dos individuos en el esquema social. ([2])

En última instancia se trata de determinar si el lenguaje proferido y la conducta desplegada por el acusado son castigables bajo dicho artículo, sin importar que hayan sido dirigidos contra un oficial del orden público. Requiere examinar, en primer lugar, si tal lenguaje y conducta del acusado sería castigable de dirigirse hacia cualquier otro ciudadano, pues de no serlo, ello dispondría del caso.

En *Pueblo* v. *Ways*, 29 D.P.R. 334, 335 (1921), el precepto antecesor del Art. 260 ([3]) fue disectado en tres formas básicas de alterar la paz, que hoy constituyen los incisos (a), (b) y (c). A su vez, fueron especificados varios modos por los que se puede incurrir en la comisión de la modalidad que nos ocupa. Dijimos que ésta consistía "en perturbar la paz o tranquilidad de algún vecindario o individuo con: *a.* Fuertes o inusitados gritos; *b.* Conducta tumultuosa [u] ofensiva ...; *c.* Amenazas; *d.* Vituperios; *e.* Riñas; *f.* Desafíos; o *g.* Provocaciones". ([4])

El término *ofensivo* fue definido en ese caso como "cualquier cosa que causa disgusto, que produce dolor, u origina sensaciones desagradables". Pág. 337. "Vituperios" se conceptuó de la siguiente forma:

---

([2]) Aunque surge de los autos la presencia de la esposa del acusado al momento de ocurrir dichos incidentes, así como testimonio de cargo tendente a demostrar que el ruido de la música no dejaba dormir a algunos vecinos, la teoría principal ha sido que el lenguaje utilizado ofendió al agente Morales.

([3]) Art. 368 (33 L.P.R.A. sec. 1439).

([4]) Notamos cierta imbricación entre esas modalidades, aparte de que en un curso de conducta pueden concurrir varias. En *Ways*, se estimó que el lenguaje allí utilizado ("lambeojo", "fariseo" y "Judas") podía ser calificado de conducta ofensiva por estar incluido en ese término el uso de lenguaje abusivo en público. Se entendió que también podía calificarse el lenguaje bajo "vituperios" por ser imputaciones públicas. La excesiva imbricación en los estatutos contemporáneos de alteración de la paz ha sido señalada. R. Force, *Decriminalization of Breach of the Peace Statutes: A Nonpenal Approach to Order Maintenance*, 46 Tul. L. Rev. 365, 384 (1972).

"Falsear, presentar o exponer a calumnia o ridículo; difamar; calumniar; vilipendiar."

". . . exponer injustamente a desprecio o vergüenza . . . .".

". . . Baldón u oprobio que se dice a uno. Acción o circunstancia que causa afrenta o deshonra" . . .

"decir mal de una persona o cosa, notándola de viciosa o indigna." Pág. 338.

La actuación del acusado, bien puede entenderse que es la que se intenta prohibir en el estatuto como "vituperios" o conducta tumultuosa u ofensiva. Ninguna otra consideración de hermenéutica obsta a que se pueda interpretar que el estatuto prohíbe precisamente el tipo de lenguaje utilizado. Nos explicamos.

■ En ninguna de esas modalidades se requiere la presencia del elemento de alteración de la paz del público para que proceda una convicción. El hecho de que las palabras hayan sido pronunciadas por una persona hacia otra sin que aparezca que afectaron a algún sector de la comunidad, no hace que el acto deje de ser punible. Ello quedó aclarado con la decisión de este Tribunal en *Vizcarra Castellón* v. *El Pueblo*, 92 D.P.R. 156 (1965).([5])

En *Vizcarra Castellón* resaltamos la decisión en *Ramos* v. *Tribunal de Distrito*, 73 D.P.R. 417 (1952), como muestra de que no se requería que se afectara segmento alguno del público.([6]) Alertamos allí contra el uso indiscriminado de decisiones bajo otros estatutos con requisitos diversos a los del

---

([5])*Ways* parecía intimar lo contrario, aunque el caso reconoció que podía perturbarse la paz de un vecindario *o de un individuo,* lo que fue reafirmado recientemente en *Pueblo* v. *Arcelay Galán,* 102 D.P.R. 409 (1974). Otras decisiones nuestras tendieron a reflejar que, aunque se tratara de alterar la paz individual, siempre era necesario que hubiese algún grado de publicidad. Véase *El Pueblo* v. *Ruiz,* 29 D.P.R. 74 (1921); *Pueblo* v. *Pérez,* 43 D.P.R. 447 (1932) y *Pueblo* v. *Castro,* 61 D.P.R. 97 (1942). En alguna medida esa tendencia se desviaba del razonamiento de que el delito de alteración se encuentra entre aquellos que se dan contra la paz pública. *El Pueblo* v. *Vaz,* 28 D.P.R. 926 (1920).

([6])La conducta envuelta fue "atisbar" por la ventana del dormitorio del matrimonio perjudicado, cuando éstos se disponían a dormir.

nuestro. Estimamos que, en contraposición al de Nueva York, el nuestro se asemejaba más al de Connecticut, al no requerir que se tratara de conducta que tuviera la intención de alterar la paz o que ocasionara tal alteración. (⁷)

El nuestro, se interpretó, "en su modalidad relativa a *conducta ofensiva y vituperios* no exige, ni que el acto sea visto o las palabras oídas por una o más personas en adición a las que fueron directamente afectadas o que dé lugar a tal conmoción y desorden que afecten la tranquilidad general de una parte sustancial de la comunidad". Pág. 167. (⁸)

Tal análisis deja al desnudo la realidad de que la sola conducta del acusado para con el policía al dirigirle "vituperios" que le ofendieron es punible bajo el estatuto cuando se trata de un ciudadano común, sin que haya que entrar en consideraciones de si en efecto provocó con ello violencia o se

---

(⁷) Se señaló que bajo el estatuto de Nueva York no era delito "el proferir palabras obscenas . . . en ausencia de alegación y . . . prueba de los elementos indicados. . . ". Pág. 166.

(⁸) Curiosamente, los requerimientos del estatuto de Nueva York han hecho girar la cuestión de si se puede cometer el delito de conducta desordenada por proferir lenguaje abusivo o insultante, sobre el que haya o no otras personas presentes. No se considera cometida la ofensa por no haber ese elemento de publicidad o prueba del mismo en *People* v. *Lukowsky*, 159 N.Y.S. 599 (1916); *People* v. *Sternberg*, 254 N.Y.S. 488 (1931); *People* v. *Cuvelier*, 167 N.Y.S.2d 871 (1957); *People* v. *La Sister*, 170 N.Y.S.2d 702 (1958); *People* v. *Suits*, 195 N.Y.S.2d 464 (1960). Se ha considerado cometida la ofensa, siendo el policía el objeto y cuando ha habido el elemento público, en: *People* v. *Sadowsky*, 267 N.Y.S. 762 (1933); *People* v. *Lavoy*, 124 N.Y.S.2d 639 (1953); *Lippert* v. *State*, 139 N.Y.S.2d 751 (1955); *People* v. *Jones*, 63 N.Y.S.2d 399 (1946); *People* v. *Santora*, 209 N.Y.S.2d 499 (1961); *People* v. *Todaro*, 310 N.Y.S.2d 303 (1970).

En Puerto Rico, cuando el lenguaje abusivo u ofensivo ha sido dirigido contra un policía en público, se ha estimado alterada la paz del "pueblo" o de otras personas presentes. Véanse *Pueblo* v. *Rivera*, 48 D.P.R. 570 (1935); *Pueblo* v. *Massó*, 18 D.P.R. 530 (1912). La sola prueba de la pronunciación de la frase "esos policías y esta detective son unos abusadores y unos charlatanes" en un tono alto, que se oía, estando el imputado un poco exitado, algo violento, no fue suficiente en las circunstancias para que se considerara cometido el delito de alterar la paz. *Pueblo* v. *Kortright*, 70 D.P.R. 399, 401 (1949). Estos casos no nos sirven para resolver la cuestión que nos ocupa.

alteró el orden o la paz pública o de si la conducta conllevaba esas probabilidades. Un cambio en el énfasis de los intereses envueltos corrobora lo antes dicho. Principios de fundamental jerarquía, raigambre constitucional que se dirigen a proteger al ciudadano individual contra toda afrenta a su honra, reputación, dignidad e integridad, han venido a predominar sobre los que animaban el estatuto; se destacaba el interés en preservar el orden, la paz y tranquilidad del público en general. (9) Hay que reconocer, de todos modos, que el mayor énfasis en aquellos intereses individuales no anula del todo este último, si se considera que al protegerse el interés individual se protege también el del público, pues las actuaciones individuales pueden tener la consecuencia de una alteración de la paz del público. Sin embargo, todavía el estatuto nos confronta con la problemática de que a la luz de su redacción y el desarrollo jurisprudencial, no existen criterios discernibles para determinar en qué medida la conducta o lenguaje ofensivo o insultante utilizado por una persona contra otra debe hacer inminente o acercar el acaecimiento de un evento que, en efecto, altere la paz y el orden público. Más bien el estado de derecho que refleja nuestra jurisdicción, tal y como antes expuesto, excluye entrar en ese tipo de consideraciones. (10)

## II

La situación expuesta exige tomemos en cuenta otro derecho de igual majestuosidad como lo es el de la libre expresión.

---

(9) Ilustrativos en este desarrollo de nuestra jurisprudencia resultan el propio caso de *Vizcarra Castellón*, supra, y luego el de *Pueblo* v. *Figueroa Navarro*, 104 D.P.R. 721 (1976). El primero cita a *State* v. *Boyer*, 198 A.2d 222 (Conn. 1963): "Cada individuo tiene derecho a la seguridad de su persona, a estar libre de ser molestado injustificadamente por otros, y a ser protegido por la ley contra la intrusión injustificada de su tranquilidad. Sobre estas bases descansa la existencia de una sociedad ordenada y civilizada". El segundo aludió expresamente al Art. II, Sec. 8 de la Constitución del Estado Libre Asociado de Puerto Rico.

(10) R. Force, *op. cit.*, págs. 384–85.

Puerto Rico se encuentra, así, desvinculado del fluir de los tiempos, ([11]) en cuanto a incorporar a nuestro estatuto los principios doctrinales que se han venido elaborando recientemente en torno a la Primera Enmienda de la Constitución norteamericana, para garantizar que no se penalice expresión protegida. Veamos la evolución habida.

■ El Tribunal Supremo de Estados Unidos estableció desde época temprana los límites de la expresión que constitucionalmente podía estar sujeta a sanción penal. *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942). La decisión establece que se podrá intervenir con la expresión o lenguaje del ciudadano, cuando legítimamente exista un interés o propósito de salvaguardar el orden público. Ese interés adquiere predominio, cuando se trata de palabras de riña (*fighting words*). Éstas fueron definidas como las que por el simple hecho de ser proferidas infligen daño o tienden a causar una inmediata alteración de la paz. Para determinar si se trata o no de ese tipo de palabras, hay que atender a las que un hombre de inteligencia común entendería que pueden causar el que una persona promedio o de sensibilidad ordinaria reaccione violentamente en respuesta a habérselas proferido.

Subsiguientemente a *Chaplinsky*, y sobre la base de la norma en ese caso sentada, todavía el más alto tribunal federal tuvo la oportunidad de invalidar estatutos estatales por estimarlos demasiado amplios, y susceptibles, por tanto, de ser aplicados indebidamente a expresión protegida. *Cohen* v. *California*, 403 U.S. 15 (1971), y *Gooding* v. *Wilson*, 405 U.S. 518 (1972).([12])

---

([11]) R. B. Watts, *Disorderly Conduct Statutes in Our Changing Society*, 9 Wm. & Mary L. Rev. 349–50 (1967-68).

([12]) En *Cohen*, tratábase de un individuo que durante una manifestación usó por los pasillos de un tribunal una chaqueta (*jacket*) con las palabras "F . . k the Draft". El precepto invalidado fue la Sec. 415 del Código Penal de California, antecesor del Art. 368 de nuestro Código Penal derogado. *Gooding* versaba sobre lenguaje abusivo e insultante dirigido a dos policías que intervenían con un grupo de manifestantes. Se invalidó

Luego devolvió a los tribunales de origen tres casos([13]) que envolvían el uso del lenguaje ofensivo o insultante para ser considerados a la luz de esas decisiones. Al regresar el caso de *Lewis*, el Tribunal Supremo no estuvo convencido del esfuerzo realizado por el foro estatal tendente a limitar el alcance de la ordenanza envuelta, en cuanto a que esencialmente proscribía el uso de lenguaje ofensivo u oprobioso "hacia o con referencia a cualquier miembro de la policía de la ciudad mientras se desempeña en su deber". Se dio particular importancia a la amplitud del término *oprobioso* que ya había sido explorada con relación al uso del mismo término en el estatuto envuelto en *Gooding*. ([14])

## III

El análisis que antecede nos permite contestar el enigma a que aludimos al inicio de esta opinión.

El problema de si puede cometerse una alteración de la paz cuando el lenguaje ofensivo se dirige a un policía es igual, ya sea bajo un estatuto interpretado como que se requiere que se trate de palabras que pueden tener la consecuencia inmediata de una respuesta violenta, o bajo uno que permita

---

igualmente por penalizar expresión en exceso de la medida constitucional. En ambas decisiones el estatuto fue declarado inconstitucional, sin considerar si la conducta o expresión envuelta eran palabras de riña (*fighting words*) que, en efecto, pudiera ser penada bajo un estatuto más estrecho.

([13]) *Rosenfeld* v. *New Jersey*, 408 U.S. 901–902 (1972); *Lewis* v. *City of New Orleans*, 408 U.S. 913 (1972); *Brown* v. *Oklahoma*, 408 U.S. 914 (1972).

([14]) En general, M. Pearlstein, Note: *Constitutional Law—The "Fighting Words Doctrine" is Applied to Abusive Language Toward Policemen*, 22 De Paul L. Rev. 725 (1973).

Alguna jurisprudencia que utiliza la definición de *fighting words: City of St. Louis* v. *Tinker*, 542 S.W.2d 512 (Mo. 1976); *State* v. *Saunders*, 339 So.2d 641 (Fla. 1976); *Skelton* v. *City of Birmingham*, 342 So.2d 933; 342 So.2d 938 (1976); *Matter of Welfare of S.L.J.*, 263 N.W. 412 (Minn. 1978); *Deavers* v. *Standridge*, 242 S.E.2d 331 (Ga. 1978); *Brown* v. *State*, 358 So.2d 16 (Fla. 1978); *State* v. *Nuthelet*, 38 S.A.2d 642 (R.I. 1978); *State* v. *Hoffman*, 387 N.E.2d 239 (Ohio 1979).

que se castigue el lenguaje que no llegue a ese extremo. ([15]) Las razones para asumir que la paz de un policía puede ser alterada al igual que la de cualquier otro ciudadano o que ello no debe permitirse, son variadas. El poco debate que ha provocado la cuestión no añade mucho a las dos posibles proposiciones. En apoyo de la segunda, se dice que el policía es el encargado de la preservación de la paz como su función primordial, ([16]) y que por ello no puede esperarse razonablemente que se inclinen a alterarla. Además, que está especialmente entrenado para entender y solventar situaciones difíciles, lo que presupone el ejercicio en sus actuaciones de un mayor grado de autorrestricción. Se apunta el riesgo de que la Policía pueda imputar el delito de alteración de la paz por actos contra su persona, lo cual puede prestarse a abusos y arbitrariedades, aparte de que le otorga un pretexto para arrestar cuando no tuviera ningún otro motivo válido para hacerlo, en especial a personas que le parecen objetables o sospechosas. Sobre este último peligro se ha dicho que se acentúa, si el policía cuenta con un estatuto considerablemente amplio. ([17]) En apoyo de la proposición de que la paz del policía puede ser alterada está la premisa y el convencimiento de que el policía es acreedor a la misma protección que el resto de los ciuda-

---

([15]) En *Matter of Welfare of S.L.J.*, supra, se determinó que no eran palabras de riña *f . . k you pigs* dirigidas a un policía desde una distancia considerable a la vez que la chica que las profería se alejaba más de aquél. No se consideró si era relevante que se tratara de un policía. Es especulativo el razonar que si eran palabras de riña, quizás ello no hubiera importado. Al mismo efecto: *Clanton* v. *State*, 357 So.2d 455 (Fla. 1978). En *Hammond* v. *State*, 498 S.W.2d 652 (Ark. 1973), se encontró que el lenguaje allí utilizado contra un policía era de riña, tomando "conocimiento judicial" de ello. A distinta solución se llegó en *Garvey* v. *State*, 537 S.W.2d 709 (Tenn. 1975), al gritarle *sooey* a un agente desde un carro en marcha.

([16]) Véanse: S. H. Asch, *Police Authority and the Rights of the Individual*, New York, Ed. Arco, 1967, Cap. 2, pág. 18; *Police*, National Advisory Commission on Criminal Justice Standards and Goals, 1973, págs. 13–14.

([17]) *People* v. *Lukowsky*, supra; *Village of Salem* v. *Coffey*, 88 S.W. 772 (Mo. 1905). Note, 84 U. Penn. L. Rev. 101 (1935); R. Force, *op cit.*, pág. 384.

danos contra interferencias indebidas con su paz y tranquilidad, por el simple hecho de su condición como ser humano. Ahora bien, por esa misma realidad se le considera falible y capaz de fallar a su deber bajo la presión del abuso y la afrenta y, por ende, reaccionar o responder violentamente.

Otros van más lejos al añadir que en el policía aumenta la protección de esos intereses individuales por la naturaleza inherente de su trabajo y las restricciones que sobre éste se imponen, lo que lo condena a no poder responder violentamente. De lo contrario, se le expondría a la tentación de que viole la ley. ([18])

Ciertamente se puede argumentar con persuasión cualesquiera de ambas posiciones extremas.

## IV

Al reflexionar sobre esta problemática en Puerto Rico, opinamos que la clave estriba en reconocer que la Policía se compone de individuos. No sólo se socavaría la dignidad y autoridad de dicho cargo al negarle protección contra el insulto gratuito y obsceno, sino que se devaluarían los principios constitucionales que promulgan la dignidad del ser humano y la igual protección de las leyes. La Policía es acreedora a la misma protección que otras personas. Al asumir tan importante función no renuncian a ese intangible —pero real— elemento de honra que todos albergamos en nuestro espíritu. ¿Cómo exigirles respeto, si están sujetos al insulto y oprobio sin ninguna sanción? ([19])

---

([18])*Pavish* v. *Meyers*, 225 P. 633 (1924); *Davis* v. *Burgess*, 20 N.W. 540 (Mich. 1884); *City of De Soto* v. *Hunter*, 122 S.W. 1092 (Mo. 1909), que revocó a *Salem*, en el escolio anterior. *Elmore* v. *State*, 83 S.E. 799 (Ga. 1914). Note: *A Breach of the Peace by the Spoken Word*, 33 Conn. B.J. 114, 120 *et seq.* (1959).

([19])En justo reconocimiento y por recoger en parte correctamente la norma aplicable al caso de autos, reproducimos el razonamiento de la ilustrada sala de instancia:

"Entendemos que la epidermis sentimental y emocional de un policía no debe ser tan sensitiva que se irrite al menor ataque verbal que le

Desde el otro extremo, cierto es que los policías tienen la especialísima función de preservar el orden y que durante el curso de su entrenamiento deben ser preparados para ejercitar un mayor grado de autorrestricción. Es anticipable que al intervenir con ciertos ciudadanos en determinadas situaciones, surjan roces y fricciones.

■ Ante el dilema, resolvemos que la aplicación de la modalidad (a) del Art. 260 del Código Penal, tal y como ha sido interpretada, *no* está totalmente excluida cuando el sujeto es un policía. Sin embargo, entre todas las circunstancias a ser consideradas para la crucial determinación de si las palabras resultan ser "de riña", siempre ha de atenderse al hecho de que en la relación de un policía debe esperarse un mayor grado de control de sus emociones, demostrando un alto grado de tolerancia ante las posibles afrentas de que pueda ser objeto en fluidas situaciones. ([20])

## V

■ Aplicado al caso de autos el derecho expuesto, nos inclinamos a fallar que debe penalizarse la conducta y len-

---

infrinja [*sic*] un ciudadano. Por otro lado, no podemos permitir, ni aceptar que dicha epidermis sea lo irrazonablemente insensible para sentir la ofensa moral y el atropello emocional y sentimental que cierto ataque verbal, de índole amenazante, insultante y denigrante, pueda causar en su ánimo. Ninguna de estas circunstancias extremas o polares pueden justificarse en derecho. *En otras palabras, existen agresiones verbales que pueden y deben ser toleradas por el agente del orden público, pero existen otras que no, las cuales exigen indefectiblemente, la acción punitiva y penal del estado en protección de unos bienes o valores jurídicos.*

"Estamos de acuerdo con el apelante en el sentido que no todo lenguaje empleado contra un policía puede constituir alteración a la paz, ya que es menester esperar que el mismo tenga un grado mayor de tolerancia que la de un ciudadano común y corriente ante una conducta desordenada. Pero, *lo anterior no puede convertir a la policía en un recipiente gratuito de cuanta escoria verbal se profiera en su contra.*" (Bastardillas nuestras.)

([20]) Véase opinión concurrente del Juez Powell en *Lewis* v. *City of New Orleans*, supra, págs. 913–914, que cita la posición adoptada por el Código Penal Modelo. Además: Pearlstein, Note, *supra*, págs. 734–35. Allí el Tribunal Supremo no entró a considerar si al policía podía provocársele a ofrecer una respuesta violenta por el uso en su contra de palabra dañinas.

guaje del acusado Caro González hacia el policía Morales. Las palabras proferidas, dentro del significado que le atribuye la idiosincracia general de nuestro pueblo, por su propia naturaleza, más que de carácter de molestia, resultan ofensivas, hirientes e irritantes, capaces de provocar una respuesta violenta (de riña) y, por consiguiente, una alteración de la paz. ([21]) Únicamente el autocontrol del agente policiaco evitó que tales epítetos culminaran en violencia.

*Se dictará sentencia confirmatoria.*

El Juez Presidente Señor Trías Monge disintió sin opinión y los Jueces Asociados Señores Rigau y Díaz Cruz emitieron opiniones concurrentes.

—o—

Opinión concurrente emitida por el Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 24 de diciembre de 1980

Se plantea en este recurso el sencillo problema de si a un policía se le puede alterar la paz, a la luz del Art. 260 (a) del Código Penal.

En lo pertinente, dicho artículo dispone que será sancionada con pena de reclusión que no excederá de seis meses o multa que no excederá de $500 ó ambas penas a discreción del tribunal, toda persona que voluntariamente realizare el siguiente acto:

(a) Perturbare la paz o tranquilidad de algún individuo o vecindario, con fuertes e inusitados gritos, conducta tumultuosa u ofensiva o amenazas, vituperios, riñas, desafíos o provocaciones.

---

([21]) Adviértase que los hechos no están en controversia. Aunque las palabras fueron proferidas desde el interior del hogar del acusado, cuando aparentemente estaba ebrio y tenía las puertas y ventanas cerradas, amagaba con un palo e invitaba a los policías a subir amenazándolos con golpearlos si lo hacían. Por otro lado, su conducta negaba tal hecho, pues no estaba dispuesto a dejarlos entrar y cumplir con sus amenazas.

De los hechos surge que los policías Manuel Morales y José A. Vega se personaron en la residencia del apelante en la noche del 30 de mayo de 1979, respondiendo a una querella de la esposa del apelante debida a desavenencias conyugales.

Al llegar a la casa del apelante, el policía Morales miró hacia adentro por una de las ventanas. Al acusado percatarse de la presencia de la Policía, entre otras, profirió las siguientes palabras: "La policía que se vaya al carajo, ustedes son unos pendejos. Suban arriba que les voy a entrar a palos". Mientras eso decía, daba cantazos con un palo de escoba.

El apelante fue acusado, encontrado culpable y sentenciado por el Tribunal de Distrito, Sala de Aguada, con una multa de $100. El Tribunal Superior confirmó dicha sentencia.

Se ha argumentado en apoyo de una solicitud de revocación de sentencia, que un policía viene obligado a tolerar un grado de insultos y de provocaciones que no vienen obligados a tolerar los ciudadanos que no son policías. Se argumenta que el policía está entrenado para afrontar esas situaciones y que es su deber sobrellevarlas.

Eso es así hasta cierto punto, pero llega un momento en que deja de serlo. Si bien es cierto que un policía está entrenado —o debe estarlo— para afrontar situaciones difíciles, eso no quiere decir que viene obligado a soportar toda clase de insultos, faltas de respeto, improperios y provocaciones. Por ejemplo, el cirujano está entrenado para no desmayarse cuando ve sangre. Eso no nos autoriza a cortar a los cirujanos impunemente. El policía es también un ser humano. No deja de serlo al ponerse el uniforme. Si viola la ley, se le aplican las sanciones penales igualmente que a cualquier otro ciudadano. De la misma forma, tiene el derecho a la protección de su persona, honra, honor y bienes, que por virtud de la Constitución, del Código Penal y otras leyes tienen los demás ciudadanos.

Los improperios proferidos en el caso de autos contra el

policía van más allá de lo permisible. No se le puede pedir a un hombre que deje de respetarse a sí mismo y de darse a respetar y que tolere y dé por bueno insultos y provocaciones de esa naturaleza. Persona de tan endeble contextura moral no serviría ni para policía ni para militar, y como hombre tampoco se le podría situar en los mejores escalafones. Desde luego, no estoy abogando porque la Policía, ni nadie, tome la justicia por su propia mano. En el caso de autos, el policía hizo lo que tenía que hacer: formular una denuncia.

La conducta del apelante cae dentro del significado de conducta ofensiva, vituperios, desafíos o provocaciones que contempla el Código Penal y que igualmente contemplaba su antecedente, el Art. 368 del anterior Código Penal, 33 L.P.R.A. sec. 1439. *El Pueblo* v. *Ways*, 29 D.P.R. 334 (1921).

El delito de alteración de la paz comprende dos modalidades: la alteración de la paz pública y la alteración de la paz o tranquilidad de un individuo en particular. *Pueblo* v. *Arcelay Galán*, 102 D.P.R. 409, 418 (1974). También en otras jurisdicciones, estimo que, con buen sentido humano y justiciero, se ha resuelto que el policía es acreedor a la misma protección que los demás ciudadanos contra violaciones indebidas a su paz y tranquilidad. *Davis* v. *Burgess*, 20 N.W. 540 (1884); *Elmore* v. *State*, 83 S.E. 799 (1914); *People* v. *Fenton*, 168 N.Y.S. 725 (1917); *Whitten* v. *Mayor and Aldermen of Savannah*, 106 S.E. 302 (1921); *Pavish* v. *Meyers*, 34 A.L.R. 561 (1924); *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942); *Jones* v. *Commonwealth*, 210 S.W.2d 956 (1948); *City of Saint Paul* v. *Morris*, 104 N.W.2d 902 (1960) cert. denied 81 S.Ct. 692, y *Meyers* v. *State*, 484 S.W.2d 334 (1972).

El Juez Superior Hon. José L. Capella Capella se manifestó acertadamente al expresarse como sigue:

Estamos de acuerdo con el apelante en el sentido que no todo lenguaje empleado contra un policía puede constituir alteración a la paz, ya que es menester esperar que el mismo tenga un

grado mayor de tolerancia que la de un ciudadano común y corriente ante una conducta desordenada. Pero, lo anterior no puede convertir a la policía en un recipiente gratuito de cuanta escoria verbal se profiera en su contra.

La Constitución y las leyes de Puerto Rico le exigen al policía una conducta civilizada, pero también le protegen a él de la conducta incivil de las demás personas. Por eso convengo en la confirmación de la sentencia apelada.

—O—

Voto concurrente en el resultado del Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 24 de diciembre de 1980

No puedo concurrir nada más que en el resultado frente a la fluidez de los fundamentos de decisión.

La universalidad de la dignidad humana, es como la libertad, valoración primordial de la sociedad democrática, y se reafirma en nuestra Constitución mediante una prohibición expresa contra la discriminación en el disfrute de los derechos fundamentales sobre la base de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas.

Proclama el Art. 1 de la Declaración Universal de Derechos del Hombre[1] adoptada por las Naciones Unidas el 10 diciembre, 1948:

Todos los seres humanos nacen libres e iguales en dignidad y derechos, y dotados, como están, de razón y conciencia, deben comportarse fraternalmente los unos con los otros.

En respeto a esta declaración que enaltece la civilización no podría unir mi voto a una opinión que aísle al policía de la

---

[1] Considerada el más prestigioso y mejor logrado esfuerzo por definir los derechos esenciales del hombre. *La Nueva Constitución de Puerto Rico*, Informes a la Convención Constituyente por la Escuela de Administración Pública U.P.R., 1954, pág. 218.

humanidad y condicione su dignidad a la intensidad de agravio del delincuente.

Todos los hombres son iguales bajo la ley y en Puerto Rico, por expresión afirmativa de nuestra Constitución, la dignidad de todo ser humano es inviolable. Art. II, Sec. 1. Esta disposición recoge un fundamental principio de moral que ni se afecta ni se diluye porque la persona, hombre o mujer, pertenezca a la Policía. El Derecho penal rige y se aplica con absoluta universalidad, sin licencia para el infractor predicada en la condición social, naturaleza del trabajo, y demás conceptos en que se funda la abolición del discrimen en nuestro régimen de derecho.

Recientemente la Asamblea Legislativa derogó la pena indeterminada y optó por sentencias fijas (Ley Núm. 100 de 4 de junio de 1980) para corregir la desigualdad e injusticia que representa la imposición de penas radicalmente dispares por el mismo delito en las distintas salas de justicia, situación que introdujo un predominante arbitrio del juzgador que desplazó la uniformidad y el esencial propósito correctivo legislado en la aplicación del estatuto. Ante esta reforma, incorporada como alto relieve al proyecto de Código Penal federal pendiente en el Congreso, sería de todo punto regresiva la recomendación de dejar al arbitrio de cada uno de nuestros jueces la medición de la potencialidad de reacción de cada policía, y la comparativa intensidad de agravio en la conducta del ofensor, para concluir si ha habido o no una perturbación de la paz. No vemos cómo podría llegarse a una determinación por el juez sin la ayuda de un panel de siquiatras.

El Derecho penal no debe sufrir estos alambicamientos en nuestro medio que depende de los tribunales para el fortalecimiento y protección de las instituciones y los recursos de vida civilizada, asediados por la explosión de violencia e incultura. Si los policías están muriendo por la seguridad de nuestro pueblo, ¿cómo degradar su respetabilidad y su propio

decoro convirtiéndolos en amables objetos de insulto y provocación porque no habrá delito en ello si el grado de susceptibilidad del policía conjugado con el de intensidad del agravio no satisface el criterio de un juez que no tiene a su alcance los medios de análisis sicosomático para hacer una determinación informada?

Más que *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942), y *Gooding* v. *Wilson*, 405 U.S. 518 (1972), pronunciamientos dirigidos a la protección de la libertad de palabra, y no del insulto, que se producen en un medio de convivencia distinto al nuestro, debe guiarnos el singular mandato de dignidad humana en nuestra Constitución. El propio Tribunal Supremo federal invita a la diversidad en la aplicación del Derecho penal cuando dice: "No es realista, ni constitucionalmente correcto leer la Primera Enmienda como exigiendo que la gente de Maine o de Mississippi acepte la noción de conducta tolerable en Las Vegas o en la ciudad de New York." *Miller* v. *California*, 413 U.S. 15, 32 (1973).

Hay que seguir la conciencia puertorriqueña que percibió el Prof. Miró Cardona en su carta de 30 de julio, 1968 al Presidente de la Comisión de lo Jurídico Penal del Senado acompañando el proyecto de Código. "Nosotros hemos considerado que un Código debe ser efecto de un precipitado histórico. Puerto Rico es de raíz española. Por cuatro centurias recibió la savia de la nación descubridora; y por más de medio siglo, por evidentes razones geopolíticas, viene experimentando la influencia norteamericana. Pero, a través del lento decursar del tiempo ha cuajado una clara, definida y potente conciencia puertorriqueña, que reclama con imperio ser regida por sus propias normas.

La afirmación anterior no implica aislacionismo ni desconocimiento del acervo jurídico penal foráneo, algunas de cuyas experiencias se recogen en el Borrador; pero creemos que no se da satisfacción al anhelo puertorriqueño importando instituciones jurídicas por perfectas que se consideren en el

país de origen." ". . . En efecto; nada es más escabroso que la sustitución repentina de las instituciones que han permeado profundamente la conciencia jurídica de la comunidad; y siempre es peligroso importar instituciones por perfectas que se consideren en su país de origen. 'Frente a un texto literalmente idéntico', ha dicho Battaglini, 'la doctrina y la jurisprudencia de dos países distintos, pueden no decir la propia cosa'. Detrás de la letra se encuentra el diverso espíritu del pueblo formado por un complejo de 'tradiciones indestructibles' y 'de necesidades actuales' de orden moral, económico, social y político, del todo particulares e inconfundibles. En ese complejo de lo 'tradicional' y de lo 'actual' se concretan, según Max Ernst Mayer, las normas de cultura de una comunidad cuya contradicción configura la conducta antijurídica." J. Miró Cardona, *Borrador para un Proyecto de Código Penal Puertorriqueño*, 41 Revista Jurídica de U.P.R. 401, 405, 410 (1972).

La falta de precisión y sobrextensión de la norma propuesta para el delito de alterar la paz de un policía, la colocan en el centro mismo de conflicto con la doctrina constitucional que gobierna la definición del delito. No son los tribunales, sino la Asamblea Legislativa, quien realmente declara el delito. *Pueblo* v. *Santiago Vázquez*, 95 D.P.R. 593, 595 (1967); *Winters* v. *New York*, 333 U.S. 507 (1948); *Connally* v. *General Const. Co.*,(²) 269 U.S. 385 (1925).

El delito de alterar la paz (Art. 260(a), Código Penal, 33 L.P.R.A. sec. 4521(a)) en su modalidad de lenguaje ofensivo e insultante se configura con el significado (³) de los vo-

---

(²) Difícilmente podrá existir el imperio de la ley si puede obtenerse una convicción contra una persona por haber violado un estatuto que prohíbe u ordena un acto en términos tan vagos que hombres de inteligencia común tengan que adivinar su significado y diferir sobre su aplicación.

(³) El Art. 6 del Código Penal, 33 L.P.R.A. sec. 3021, conmina a interpretar las palabras y frases "según el contexto y el significado sancionado por el uso común y corriente".

cablos, independientemente de la reacción del ofendido al agravio, que puede ser de prudente silencio con o sin llanto, de contestación en similar lenguaje o de arrebato violento contra el ofensor. Por tanto, sea el agraviado un ministro de Dios, un militar, un policía, o una bailarina, su particular susceptibilidad no es elemento integrante del delito. Un requisito esencial de la definición de todo delito[4] es que contenga elementos que de su simple lectura hagan conocible con substancial precisión la línea que separa la conducta lícita de la delictiva. Se borraría y perdería esa frontera si, en este delito de alterar la paz, se incorporara como elemento configurante la impredecible reacción de la parte agraviada. Esa fue razón subyacente en las decisiones de este Tribunal sancionando como alteración de la paz la simple invasión de la vida íntima como rondar una casa y retratar con lente telescópico las personas que allí se encuentran (*Pueblo* v. *Figueroa Navarro*, 104 D.P.R. 721 (1976)); o atisbar (*Ramos* v. *Tribunal de Distrito*, 73 D.P.R. 417 (1952)).

Mucho antes de que la igualdad en la dignidad humana alcanzara la estirpe de precepto constitucional, este Tribunal proveyó la solución correcta al caso que ahora nos ocupa sosteniendo que era delito punible como alteración de la paz bajo el Art. 368 del Código Penal la conducta del acusado que perturbó y molestó con sus palabras a los presos reunidos en la cárcel municipal, que son el vecindario de la cárcel, porque al así actuar "molestó con conducta grosera el orden y solemnidad de los presos reunidos en la cárcel . . .". *Pueblo* v. *Delgado*, 35 D.P.R. 176 (1926).

---

(4) El Art. 8 del Código, 33 L.P.R.A. sec. 3031, remite el principio de legalidad a la prohibición de acción penal por un hecho que no esté "expresamente definido por la ley como delito . . .".