BENJAMÍN CRUZ y OTRA, demandante y recurridos, *v.* WILLIAM SIERRA MAYA y OTROS, demandados y recurrentes.

*Número:* RE-91-569 *Resuelto:* 30 de junio de 1993

*Anabelle Rodríguez* y *Reina Colón de Rodríguez, Subprocuradoras Generales,* y *Laura Ydrach Vivoni, Procuradora Ge-*

*neral Auxiliar*, abogadas de El Pueblo; *José A. Cuevas Segarra*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

 El uso ilegal, abusivo e irrazonable por un policía de su arma de fuego es incompatible con nuestro diseño constitucional y jurídico, y las normas de convivencia comunitaria. Ello lo expone a la responsabilidad penal y civil. *Pueblo v. Moreno Morales I*, 132 D.P.R. 261 (1992); *Leyva et al. v. Aristud et al.*, 132 D.P.R. 489 (1993). Sin embargo, "[l]a obligación de los policías de prevenir el crimen no excluye los actos criminales contra su propia persona o propiedad. *Pueblo v. Caro González*, 110 D.P.R. 518 (1980). Lo contrario resultaría en la anomalía de que el policía tendría el deber de defender las vidas de sus semejantes, pero no la suya propia". *Sánchez Soto v. E.L.A.*, 128 D.P.R. 497, 503 (1991). "Cuando un policía tiene motivos fundados para creer que, contra él u otras personas, un sospechoso representa una amenaza de grave daño corporal, no es irrazonable constitucionalmente impedir su huida usando fuerza mortal. Por ende, si el sospechoso amenaza al policía con un arma o existen motivos fundados para creer que aquél ha cometido un delito que inflige o amenaza infligir grave daño corporal, si es necesario puede usar fuerza mortal para prevenir la huida, y de ser ello viable, le sea dada una advertencia." (Traducción nuestra.)[1] *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985).

---

[1] El primer párrafo de la Regla 16 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, recoge en esencia este principio. Dispone:

"Cuando el arresto se hiciere por un funcionario con autorización de una orden de arresto, o sin orden de arresto por un delito grave (*felony*) cometido en su presencia, si después de que se informare a la persona que ha de ser arrestada de la intención de verificar el arresto, dicha persona huyere o resistiere violentamente, el funcionario podrá usar todos los medios necesarios para efectuar el arresto.

"Para realizar un arresto en cualesquiera otras circunstancias, cualquier funcionario o persona particular podrá emplear todos los medios necesarios, excepto que no podrá infligir grave daño corporal."

El segundo párrafo incorpora nuestra doctrina jurisprudencial de que un policía no está justificado en disparar a una persona que está cometiendo un delito *menos*

# I

Benjamín Cruz y Evelyn Meléndez reclamaron una indemnización del policía William Sierra Maya, del Sr. Ahmed Mustafá, del Estado Libre Asociado de Puerto Rico,([2]) y de Alfa y Beta —compañías aseguradoras— por los daños y sufrimientos mentales experimentados con la muerte de su hijo de dieciocho (18) años, Erick B. Cruz Meléndez, ocurrida el 26 de junio de 1982 frente al negocio "Bargain City Cash and Carry" situado en la Calle 601, Bloque 204, Núm. 6, Urb. Villa Carolina, en Carolina.

En esencia, alegaron que la muerte del joven Erick B. fue "sin causa ni justificación de clase alguna; cuando [a]qu[é]l se encontraba sometido a la autoridad del mencionado oficial; mediante el uso de fuerza excesiva, desproporcionada e innecesaria; con un disparo por la [es]palda que le fracturó la base del cráneo ...". *Exhibit* VI, pág. 16.

Previo ciertos trámites, se celebró la vista en su fondo. Presentaron su testimonio Evelyn Meléndez y el economista Dr. Jaime Santiago Meléndez. Se estipuló el testimonio de Benjamín Cruz. En ocasión de la continuación de la vista, las partes acordaron someter el caso por la prueba antes referida, y sobre la forma en que aconteció la muerte, con las declaraciones juradas del sargento Sierra Maya, de Mustafá, del agente Bernardino Calcaño, de Benito Palermo García y de Rosalyn García Parra. Además, se sometieron algunas preguntas y contestaciones de un interrogatorio, dos (2) deposiciones e incluso un *video casette*. Oportunamente, el Tribunal Superior, Sala de Carolina (Hon. Gilberto Gierbolini, Juez), declaró con lugar la demanda y condenó a los codemandados a pagar solidaria-

---

*grave* en su presencia, si ésta no opone resistencia amenazadora de grave daño o huye al verlo. *Pueblo v. Burgos*, 76 D.P.R. 199 (1954); *Rodríguez v. Pueblo*, 75 D.P.R. 401 (1953).

([2]) Incluido mediante enmienda posterior a la demanda. Todos los demandados negaron la responsabilidad.

mente la suma total de treinta mil dólares ($30,000). A solicitud del Estado, revisamos.

## II

Un análisis cuidadoso y desapasionado[3] de la prueba documental —*sobre la cual estamos en la misma posición que el foro de instancia para evaluar*—[4] nos ha convencido que erró la ilustrada sala sentenciadora y procede revocar. Nos explicamos.

El 26 de julio de 1982 el policía Sierra Maya se desempeñaba como investigador del Cuerpo de Investigaciones Criminales (C.I.C.). Como tal, no estaba uniformado, sino que usaba ropa de civil. Salió de servicio a las 9:00 P.M. y se dirigió a la casa de su novia, Rosalyn García Parra. Como tenía que comprar unos artículos personales, fue con ella al colmado del lado ("Bargain City Cash and Carry"), propiedad de Mustafá. Mientras estaba allí, llegaron dos (2) jóvenes —uno blanco y el otro (Erick B.) fornido, de piel trigueña, con afro y una gorra de pelotero, *jacket*, camisa blanca y pantalón marrón— quienes le pidieron a Mustafá dos (2) cervezas Budweiser. Éste les indicó que las buscaran en la nevera, lo cual hicieron; después le solicitaron cigarrillos y fósforos, y pagaron con un menudo. La conducta de estos jóvenes le pareció sospechosa al agente Sierra Maya, pues los veía nerviosos, se miraban mucho entre

---

[3] Nos parece fuera de contexto y carente de fuerza persuasiva que se pretenda establecer una analogía entre los hechos del caso de autos y el "caso de Rodney King y de los disturbios raciales ... en ... Estados Unidos". Alegato de los demandantes recurridos, pág. 3.

Es frívola la contención de que Erick B. "se encontraba sometido a la autoridad". Tampoco estamos ante un caso de supervisión inadecuada, brutalidad policiaca, conspiración para realizar un asesinato o encubrirlo mediante ocultación, falsificación de prueba o alteración del lugar. Véanse: *Leyva et al. v. Aristud et al.*, 132 D.P.R. 489 (1993); *Pueblo v. Moreno Morales I*, 132 D.P.R. 261 (1992).

[4] *Col. Ing. Agrim. P.R. v. A.A.A.*, 131 D.P.R. 735 (1992); *Torres Arzola v. Policía de P.R.*, 117 D.P.R. 204, 213 (1986); *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 267 (1981); *Díaz de Diana v. A.J.A.S. Inc. Co.*, 110 D.P.R. 471 (1980); *Planned Credit of P.R., Inc. v. Page*, 103 D.P.R. 245 (1975); *Central Igualdad, Inc. v. Srio. Hacienda*, 83 D.P.R. 45 (1961); *Castro v. Meléndez*, 82 D.P.R. 573 (1961).

sí y les temblaban las manos.(⁵) Por esta razón Sierra Maya salió del local y buscó el arma reglamentaria (revólver) que había guardado en su automóvil. Se quedó con su novia al lado de éste —que lo había estacionado entre el negocio de comestibles y la casa de ella— y esperó a ver qué sucedía. De repente, Rosalyn, quien se encontraba frente al negocio, le dijo que lo estaban asaltando y dándole con un revólver a Mustafá. Efectivamente, Sierra Maya miró y vio al joven trigueño que golpeaba al propietario del local en la cabeza y al otro que echaba el dinero de la caja en una bolsa de estraza. Luego, los individuos salieron del local, revólveres en mano; mientras tanto, el agente Sierra Maya se había situado detrás del baúl de su carro y sujetaba con sus dos manos el arma de reglamentación. En esos momentos Sierra Maya les gritó "es la policía, alto, que es la policía" (Solicitud de revisión, pág. 4), pero ambos delincuentes hicieron caso omiso, comenzaron a correr y el de tez blanca le dijo al trigueño "tírale, tírale". En esos instantes el agente Sierra Maya vio que el sujeto trigueño inició un movimiento del cuerpo y en la mano derecha para levantar el revólver hacia él; entonces el agente hizo dos (2) disparos y lo alcanzó. Erick B. cayó de bruces al pavimento. Además, Sierra Maya disparó dos (2) veces al otro asaltante, quien se dio a la fuga abordando un vehículo que le esperaba a distancia del lugar y del cual sonó una detonación análoga a un disparo. Los asaltantes robaron más de cinco mil dólares ($5,000).

Entre las armas encontradas en el lugar, la que portaba el joven Erick B. resultó ser un revólver negro, de cañón largo, *parecido a un magnum* de perdigones, y el otro, un revólver de fulminantes.

La autopsia de Erick B. demostró que su muerte se produjo por una sola "herida de bala la cual se encuentra lo-

---

(⁵) En esos momentos no habían cometido delito alguno en su presencia y, por ende, el agente Sierra Maya no podía arrestarlos válidamente. Tampoco tenía motivos fundados para creer que ellos habían cometido un delito grave. Véase Regla 11 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

calizada en la *región occipital izquierda a 64" del talón y a 2 1/2" de la línea media*. La misma es de forma redondeada, bordes invertidos y está rodeada por un anillo de abrasión que le contornea por completo. *La exploración en profundidad reveló un trayecto de atrás hacia adelante y de abajo hacia arriba.* Siguiendo esta dirección se hace evidente que el proyectil después de perforar los tejidos blandos, fracturó el hueso occipital, laceró el hemisferio cerebral izquierdo y fue a alojarse al lóbulo frontal donde se recuperó un proyectil aparentemente calibre .38". (Énfasis suplido.) *Exhibit* N, pág. 36.

Con vista a esta prueba, el ilustrado tribunal de instancia concluyó "que los hechos y las versiones se contradicen". *Exhibit* I, pág. 3. Según su criterio, "[n]o es creíble que dos individuos que acaban de robar un establecimiento comercial con un revólver de fulminantes y otro de perdigones, enfrenten a la policía apuntándole con esos 'revólveres'. No es creíble tampoco, que la Policía se tuviera que defender de alguien que le estaba apuntando y que cuando dispara, la bala entra por la parte posterior del cráneo de uno de los que supuestamente estaba apuntando." Íd., pág. 5. Concluyó que "[e]l policía no tomó las medidas necesarias para proceder al arresto y evitar de esa forma la muerte de los asaltantes". Íd., pág. 5. Finalmente, sentenció que "[l]a prueba parece indicar que utilizó su arma de reglamento y disparó estando el asaltante de espaldas al Policía". Íd., pág. 5.

## III

Para evaluar judicialmente si la conducta del policía Sierra Maya genera responsabilidad civil —fue razonable y estuvo o no justificada— debemos recordar que "el delito de robo [es] uno de tipo grave y extremadamente peligroso para la vida humana". *Pueblo v. Lucret Giménez*, 111 D.P.R. 716, 739 (1981). Además, "que el crimen no

tiene horario específico [y p]ara conjurarlo, el Estado le exige al policía que esté siempre armado". *Sánchez Soto v. E.L.A.*, supra, pág. 502. También, que "[e]n el desempeño de sus funciones el uso de la fuerza física depende en gran medida de un juicio personal del agente frente a situaciones cargadas de gran emocionalidad y tensión nerviosa". *Informe Especial sobre los Derechos Civiles y las Intervenciones de la Policía con los Ciudadanos*, Comisión de Derechos Civiles, 1967, pág. 38.

Incontrovertidamente, el agente Sierra Maya presenció un asalto violento (delito grave) por unos individuos, que para todos los fines legales estaban armados con "revólveres". No hace diferencia que *después* resultaran ser de perdigones y fulminantes; precisamente el análisis del foro de instancia adolece de esa falla: *es a posteriori*. La creencia razonable del policía Sierra Maya tenía que ser que eran armas letales y su uso potencial ponía en riesgo tanto su vida como la de otros. *Cf. Pueblo v. Del Río*, 113 D.P.R. 684 (1982). En el contexto específico de estos hechos, el agente Sierra Maya no podía saber que las armas no eran verdaderas; tampoco exigírsele que lo supiera. Para que Sierra Maya inmediatamente disparara en legítima defensa, era suficiente que sintiera temor por su vida al estimar o verse amenazado por el exhordio de uno de los asaltantes a Erick B. de que le "tirara" y los movimientos iniciales de éste encaminados a apuntarle y usar el revólver.

A esos efectos, la prueba demostró concluyentemente que los asaltantes iban de retirada, huyendo de la comisión de un delito grave. Huían corriendo o trotando. Si Erick B. hizo ademán e inició el movimiento de apuntarle al policía Sierra Maya, ¿qué podía esperar? Indudablemente, en medio de esa situación fluida y tensa, el agente consideró que estaba en inminente peligro de grave daño corporal y rápidamente reaccionó y tomó la única decisión sensata y ra-

zonable que, *lamentablemente*, produjo el disparo mortal.([6])

Coincidimos con el Estado de que "de la prueba presentada no puede descartarse como lo hace el tribunal sentenciador que estas personas [apuntaran hacia la] policía y que al tratar de huir, *en fracciones de.segundos, cambiasen de posición resultando el impacto de la bala como finalmente resultó*". (Énfasis suplido.) Solicitud de revisión, pág. 7.

En resumen, no estamos ante una situación inherentemente increíble o físicamente imposible. No compartimos el escepticismo del tribunal sentenciador de que era poco creíble que dichos individuos enfrentaran a un policía con semejantes revólveres. Es claro que ellos no podían saber, con seguridad, que Sierra Maya era efectivamente un policía; no estaba uniformado. Y en cuanto al ademán de apuntarle, pocos minutos antes, ¿no las habían desplegado y aprovechado como armas "verdaderas"?; ¿no las habían usado violentamente y causado al dueño del establecimiento una herida sangrante en la cabeza?

En estas *circunstancias peculiares* en que la decisión no sólo era crucial, sino vital —y el factor tiempo quedó encapsulado a unos brevísimos instantes— esta fue razonable. ¿Vamos a imponerle la obligación al policía de recibir el primer disparo que puede o no ser mortal? Si contestamos en la afirmativa, "[f]laco servicio hacemos a la justicia y muy mal retribuimos un servicio tan riesgoso ...". *Ortiz Andújar v. E.L.A.*, 122 D.P.R. 817, 832 (1988).

*Se dictará sentencia revocatoria.*

El Juez Asociado Señor Hernández Denton concurrió

---

([6]) En estas circunstancias Sierra Maya cumplió cabalmente con las exigencias impuestas por la Regla 16 de Procedimiento Criminal, *supra*, y por *Tennessee v. Garner*, 471 U.S. 1 (1985). El agente advirtió a los sujetos, quienes optaron por huir, por lo que éste podía utilizar todos los medios necesarios para practicar el arresto. El uso de la fuerza mortal estuvo justificado toda vez que Sierra Maya estaba siendo amenazado con lo que a todas luces parecía un arma de fuego.

con el resultado sin opinión escrita. El Juez Asociado Señor Alonso Alonso emitió una opinión disidente.

– O –

Opinión disidente del Juez Asociado Señor Alonso Alonso.

Disiento de la opinión mayoritaria por tres (3) razones: Primero, en un caso donde el tribunal de instancia concluyó "que los hechos y las versiones se contradicen" (*Exhibit* I, pág. 3), este Foro debió haber tenido la deferencia usual a la evaluación de la prueba hecha por dicho tribunal, salvo que hubiera pasión, prejuicio o parcialidad, lo cual no existe en este caso. Véase *Pueblo v. Maisonave Rodríguez*, 129 D.P.R. 49 (1991); *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990); *Acosta & Rodas, Inc. v. PRAICO*, 112 D.P.R. 583, 608 (1982); *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762 (1987).

Segundo: el tribunal de instancia concluyó que "[l]a prueba parece indicar que [el policía usó] su arma de reglamento y disparó estando el asaltante de *espaldas* al policía". (Énfasis suplido.) *Exhibit* I, pág. 5.

*Esta conclusión está sostenida por la prueba.*

La autopsia de Erick B. demostró que su muerte se produjo por una sola "herida de bala la cual se encuentra localizada en la región occipital *izquierda* a 64" del talón y a 2 1/2" de la línea media. ... La exploración en profundidad reveló un trayecto de atrás hacia adelante y de abajo hacia arriba". (Énfasis suplido.) *Exhibit* IX, pág. 36.

Dicha autopsia lo que indica es que el disparo entró a la cabeza del occiso por el lado *izquierdo* de su *parte trasera*.

Ello es *totalmente incompatible* con la teoría de la opinión mayoritaria de que el occiso iba corriendo de retirada de espaldas al policía, y que cambió de posición para dispararle al policía teniendo el revólver de fulminantes en su *mano derecha y girándose hacia la derecha*. Si así hubiese ocurrido, la bala hubiera entrado por el lado *derecho* de la

cara o de la cabeza del occiso, y no por el lado izquierdo de la cabeza como lo determinó el informe patológico.

Este Tribunal ha sustituido la conclusión lógica del tribunal de instancia por su propia teoría ilógica de cómo ocurrieron los hechos, la cual no explica cómo es posible que el disparo entrara por la parte izquierda de la cabeza. Tampoco se cuestiona el hecho de que el occiso, conociendo que portaba un revólver falso, hiciera amago de dispararle a un policía que le daba un alto *como policía.*

Se trata aquí de determinar si a la luz de los hechos irrefutados en cuanto a la ubicación del disparo en el cadáver y de que la pistola que éste portaba era de fulminantes, es posible creer las versiones dadas por el agente Sierra Maya, su esposa y su suegro, las cuales, por razones obvias, deben examinarse con cautela. Entendemos que la balanza se inclina en contrario.

Tercero: Habiendo concluido el tribunal de instancia que Erik B. iba huyendo del área y que el policía lo mató por la espalda, hay que preguntarse si éste, en las circunstancias de autos, podía dispararle para detenerlo causándole la muerte. Entiendo que no.

El caso citado por la opinión mayoritaria, *Tennesse v. Garner*, 471 U.S. 1 (1985), sólo justificó el uso de la fuerza que provoque la muerte de una persona que está huyendo, *aun cuando haya cometido un delito grave en presencia del policía*, en circunstancias en que el policía u otra persona está amenazando de muerte o de grave daño corporal.

El Art. 22 de nuestro Código Penal, 33 L.P.R.A. sec. 3095, al definir lo que constituye legítima defensa, sólo concibe el dar muerte a un ser humano cuando el agredido o la persona defendida esté en inminente o inmediato peligro de muerte o de grave daño corporal. Un examen cuidadoso de la prueba que desfiló ante el tribunal de instancia y de las conclusiones de dicho foro reflejan que estas circunstancias no estaban aquí presentes.

La criminalidad que azota a éste y a otros países no debe ser motivo·para que este Tribunal debilite las garantías y los derechos de los ciudadanos frente al ejercicio injustificado de la autoridad de Estado. *Pueblo v. Ríos Colón*, 129 D.P.R. 71 (1991).

Precisamente es en momentos·históricos como los que vivimos, de grandes problemas y conflictos sociales e interpersonales, que este Tribunal *debe estar más atento* a que se salvaguarden los derechos individuales de los ciudadanos.