# 2001 DTA 160

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL V DE PONCE Y AIBONITO

EL PUEBLO DE PUERTO RICO
Apelado

v.

MARIA L. RIVERA SANTIAGO
Apelante

Núm: KLAN-00-01245

San Juan, Puerto Rico, a 30 de abril de 2001

Panel integrado por su Presidente, el Juez Brau Ramírez,
el Juez Ortiz Carrión y la Juez Pabón Charneco

Pabón Charneco, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La apelante, María L. Rivera Santiago, en adelante, señora Rivera, apela de una Sentencia del Tribunal de Primera Instancia, Sala de Guayanilla, en la cual se le encontró culpable del delito de alteración a la paz y se le impuso una multa de $200.00 y el pago de las costas.

Por los fundamentos que expondremos a continuación, se confirma la Sentencia apelada.

### I

Según surge del recurso, el 9 de agosto de 2000, el policía José Cordero Morales, en adelante Policía Cordero, presentó una denuncia contra la señora Rivera por una infracción al Artículo 260 del Código Penal (alteración a la paz) ■ por hechos ocurridos el 3 de agosto de 2000, mientras éste detenía a la señora Rivera por una violación ■ a la Ley Núm. 141 de 20 de julio de 1960, según enmendada, conocida como *"Ley de Vehículos y Tránsito de Puerto Rico"*, y le expedía un boleto.

El 3 de noviembre de 2000, se celebró el juicio, y el tribunal apelado, luego de escuchar la prueba, encontró a la señora Rivera culpable del delito imputado imponiéndole una multa de $200.00, más las costas.

Inconforme con dicha determinación, el 6 de noviembre de 2000, la señora Rivera presentó su recurso de apelación. El 5 de abril de 2001, el Procurador General compareció a esta Curia.

Con el beneficio de ambas comparecencias, procedemos a resolver.

### II

En su recurso, la señora Rivera plantea que incidió el Tribunal de Primera Instancia al declararla culpable del delito de alteración a la paz, cuando las declaraciones de los testigos del Ministerio Público demostraron que el delito imputado no se cometió; siendo, además, dicha prueba altamente insuficiente, la que vista en conjunto con la prueba de defensa, debió arrojar al menos una duda razonable. Asimismo, plantea que erró el tribunal de instancia al no absolver a la apelante cuando la prueba demostró que la paz del perjudicado no fue alterada, siendo esto imperativo y esencial para que se configurara el delito, conforme la jurisprudencia de *Pueblo v. Caro González,* 110 D.P.R. 518; *Pueblo v. De León Martínez,* 131 D.P.R. 746; *Pueblo v. Ruiz,* 29 D.P.R. 74.

### III

El Artículo II, Sección 11 de la Constitución de Puerto Rico garantiza el derecho a la presunción de inocencia. Este derecho requiere que toda convicción criminal esté basada en prueba suficiente con la cual se establezcan todos los elementos del delito y la conexión del acusado con los mismos más allá de duda razonable. *Pueblo v. Acevedo Estrada,* **2000 J.T.S. 22**; *Pueblo v. Colón Castillo,* 140 D.P.R. 564 (1996); *Pueblo v. Ramos Alvarez,* 122 D.P.R. 287 (1988); *Pueblo v. Bigio Pastrana,* 116 D.P.R. 748, 760-761 (1985).

Sin embargo, ello no implica que cualquier duda concebible tenga que ser derrotada por el Ministerio Público y que la culpabilidad del acusado tenga que establecerse con certeza matemática. Esta garantía sólo requiere que la prueba establezca la culpabilidad con aquella certeza moral que convenza, dirija la inteligencia y satisfaga la razón del juzgador. Duda razonable es una duda fundada, producida por el análisis y la apreciación racional y ponderada de todos los elementos de juicio que surgen de la prueba presentada en un caso. No es, pues, una duda especulativa o imaginaria basada en unos elementos aislados. *Pueblo v. Rosario Reyes,* **95 J.T. S. 74**; *Pueblo v. Bigio Santana, supra; Pueblo v. Pagán,* 130 D.P.R. 470 (1992).

Es al juzgador de los hechos a quien le corresponde aquilatar, analizar y ponderar la prueba que desfila ante sí, para darle el valor probatorio que estime adecuado. *Pueblo v. Rodríguez Román,* 128 D.P.R. 121 (1991). En un caso de naturaleza criminal, el juzgador de los hechos está en mejor posición para dirimir la prueba conflictiva, y su apreciación y análisis de la prueba debe ser merecedora de gran deferencia por el tribunal

apelativo. La norma de deferencia apelativa a la apreciación y análisis que hagan los magistrados del foro de instancia sobre la prueba que ante ellos desfila, requiere que ante una clara ausencia de pasión, prejuicio, parcialidad o error manifiesto, un tribunal apelativo se abstenga de sustituir su criterio por el del juzgador. *Municipio de Ponce v. Aut. de Carreteras*, **2001 J.T.S. 3**; *Pueblo v. Acevedo Estrada, supra; Sepúlveda v. Depto. de Salud*, **98 J.T.S. 59**; *Garriga, hijo, Inc. v. Con. Marbella*, **97 J.T.S. 129**; *Pueblo v. Maisonave Rodríguez*, 129 D.P.R. 49 (1991); *Pueblo v. Rivera Robles*, 121 D.P.R. 858, 869 (1988). Sin embargo, un tribunal apelativo no debe vacilar sobre su autoridad y debe revocar cualquier fallo condenatorio cuando un examen detenido de toda la prueba demuestre que el juzgador de los hechos descartó injustificadamente elementos probatorios importantes o fundó su criterio únicamente en testimonios de escaso valor, inherentemente improbables o increíbles. *Pueblo v. Acevedo Estrada, supra; Pueblo v. Rodríguez Santana*, **98 J.T.S. 141**; *Pueblo v. Meliá*, **97 J.T.S. 110**; *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573 (1961).

Por otra parte, el Artículo 260 del Código Penal, *supra*, tipifica el delito de alteración a la paz. Dicho artículo reza:

*"Será sancionada con pena de reclusión por un término que no excederá de seis (6) meses, pena de multa que no excederá de quinientos (500) dólares, o ambas penas a discreción del tribunal, toda persona que voluntariamente realizare cualesquiera de los siguientes actos:*

*(a) Perturbare la paz o tranquilidad de algún individuo o vecindario, con fuertes e inusitados gritos, conducta tumultuosa u ofensiva o amenazas, vituperios, riñas, desafíos o provocaciones.*

*(b) Disparare en la calle o vía pública algún arma de fuego, o que sin ser un caso de legítima defensa, sacare o mostrare en presencia de dos o más personas algún arma mortífera, en actitud violenta, colérica o amenazadora o que de modo ilegal hiciere uso de dicha arma en alguna riña o pendencia.*

*(c) Hiciere uso de lenguaje grosero, profano o indecoroso en presencia o al alcance del oído de mujeres o niños, en forma estrepitosa o inconveniente.*

*En cualesquiera de las modalidades anteriores, el Tribunal, a su discreción, podrá imponer la pena de prestación de servicios en la comunidad, en lugar de la pena de reclusión."*

El delito de alteración a la paz se fundamenta en el Artículo II, Sección 8 de nuestra Constitución. Dicho precepto constitucional reconoce el derecho de toda persona a estar protegida por la ley, contra ataques abusivos a su honra, a su reputación y a su vida privada y familiar. Véase, Dora Nevares-Muñiz, *Código Penal de Puerto Rico, Revisado y Comentado*, Hato Rey, Instituto para el Desarrollo del Derecho, Inc., 1998, a las págs. 502-503.

Los elementos esenciales del delito de alteración a la paz son: (1) la utilización maliciosa y voluntaria del lenguaje ofensivo e insultante por parte de una persona a otra; (2) el uso de tal lenguaje o conducta ofensiva perturbe la paz o tranquilidad de algún individuo o vecindario; y (3) que una vez proferidas las palabras ofensivas, éstas sean capaces de provocar una respuesta violenta o de riña a la persona a quien va dirigida. *Id.*

El precepto legal antes reseñado, clasifica en tres (3) grupos los actos que, de llevarse a cabo voluntariamente, podrían constituir el delito de alteración a la paz. *Pueblo v. Ways*, 29 D.P.R. 334 (1921). A su vez, fueron especificados varios modos por lo que se puede incurrir en la comisión de la modalidad tipificada en el inciso (a), la cual consiste *"en perturbar la paz o tranquilidad de algún vecindario o individuo con: a. Fuertes o inusitados gritos; b. Conducta tumultuosa [u] ofensiva...; c. Amenazas; d. Vituperios; e. Riñas; f. Desafíos; o g. Provocaciones"*. *Id.*

A tales efectos, dicha casuística definió *"ofensivo"* como cualquier cosa que cause disgusto, que produce

dolor, u origina sensaciones desagradables. En el mismo caso, se definió *"vituperios"* como que incluye actos, como *"falsear, presentar o exponer a calumnias o ridículo, difamar, calumniar, vilipendiar"; "exponer injustamente a desprecio o vergüenza"; "decir algún oprobio a otra persona, notándola de viciosa o indigna".* *Id.,* a las págs. 337 y 338; *Pueblo v. Caro González, supra,* a la pág. 521; Véase, además, *supra,* a la pág. 503.

Asi mismo, el inciso (a), que es el que nos resulta pertinente al caso de autos, contempla que se puede alterar la paz o tranquilidad de un individuo o un vecindario. *Pueblo v. Arcelay Galán,* 102 D.P.R. 409 (1974). La paz pública se define como aquella sensación de seguridad y tranquilidad, tan necesaria para nuestro bienestar que toda persona siente bajo la protección de la ley; y una alteración de la paz es una invasión a la protección que la ley así proporciona. *Pueblo v. Figueroa Navarro,* 104 D.P.R. 721 (1976). Por *"paz"* se entiende la tranquilidad de que gozan los ciudadanos cuando reina buen orden. *Pueblo v. De León Martínez,* 132 D.P.R. 746, 767 (1993).

El Art. 160, *supra,* penaliza no sólo aquella conducta que por su naturaleza misma atenta contra la paz pública o individual, sino aquella conducta o expresiones que, sin ser inherentemente ofensivas, las circunstancias en que se producen ocasionan de manera efectiva irritación y desasosiego en una persona de inteligencia común. El Tribunal Supremo de Puerto Rico ha expresado que *"[e]s un elemento básico, implícito y reconocido desde el año 1921, que para que el delito de alteración a la paz se configure, él o los perjudicados deben estar en paz".* *Pueblo v. De León Martínez,* 132 D.P.R. 746, 767 (1993).

No se requiere para la configuración del delito, la reacción por parte de la parte perjudicada o agraviada. *Pueblo v. Caro González,* 110 D.P.R. 518 (1980). Tampoco se exige bajo la modalidad imputada, relativa a que el acto sea visto o las palabras sean oídas por una o más personas en adicción a las que fueron directamente afectadas o que de lugar a tal conmoción y desorden que afecten la tranquilidad general de una parte sustancial de la comunidad. *Pueblo v. Castellón,* 92 D.P.R. 156 (1965). El hecho de que las palabras hayan sido pronunciadas por una persona hacia otra sin que aparezca que afectaron a algún sector de la comunidad, no hace que el acto deje de ser punible. *Pueblo v. Caro González, supra.*

El lenguaje ofensivo e insultante, se configura con el significado común y corriente de los vocablos, independientemente de la reacción del ofendido al agravío, que puede ser de prudente silencio, de contestación en similar lenguaje o de arrebato violento contra el ofensor. *Id.*

En el caso arriba mencionado, el Tribunal Supremo de Puerto Rico estableció que a un policía se le puede alterar la paz y que la Policía es acreedora a la misma protección de las leyes que los demás individuos. En dicho caso, se acusó a Caro González por el delito de alteración a la paz, toda vez que éste hizo varias manifestaciones insultantes dirigidas a agentes del orden público que se personaron a su residencia a investigar una querella.

Expresó el Tribunal Supremo que en estos casos, en última instancia, se trata de determinar si el lenguaje proferido y la conducta desplegada por el acusado son castigables bajo el Art. 260, sin importar que hayan sido dirigidos contra un oficial del orden público. *Id.,* a la pág. 1521. A tales efectos, requiere examinar si tal lenguaje y conducta del acusado sería castigable, de dirigirse hacia cualquier otro ciudadano, pues de no serlo, ello dispondría del caso. *Id.*

En conclusión, el Tribunal Supremo determinó que la aplicación de la modalidad (a) del Art. 260, *supra,* no estaba totalmente excluida cuando el sujeto era un policía. Sin embargo, entre todas las circunstancias a ser consideradas para la crucial determinación de si las palabras resultan ser *"de riña",* siempre ha de atenderse al hecho de que en la relación de un policía debe esperarse un mayor grado de control de sus emociones, demostrando un alto grado de tolerancia ante las posibles afrentas de que pueda ser objeto en fluidas situaciones. *Pueblo v. Caro González, supra,* a la pág. 529.

En ese caso, el Tribunal Supremo encontró que las palabras proferidas, dentro del significado que le atribuye la idiosincracia general de nuestro pueblo, por su propia naturaleza, más que de carácter de molestia, resultaron ofensivas, hirientes e irritantes, capaces de provocar una respuesta violenta (de riña) y, por consiguiente, una alteración de la paz.

A estos efectos, palabras de riña son las que por el simple hecho de ser proferidas infligen daño o tienden a causar una inmediata alteración de la paz. A fin de determinar si se trata o no de ese tipo de palabras, hay que atender a las que un hombre de inteligencia común entendería que pueden causar el que una persona promedio o de sensibilidad ordinaria reaccione violentamente en respuesta a habérselas proferido. *Pueblo v. Caro González, supra*.

## IV

Reseñada la norma jurídica que rige la controversia que nos ocupa, procedamos a aplicarla al asunto ante nuestra atención. Un examen minucioso y desapasionado de la Exposición Narrativa Estipulada de la Prueba y de los documentos que obran en el expediente, refleja que la prueba presentada por el Ministerio Público fue suficiente y satisfactoria en derecho, configurándose el delito imputado.

El Ministerio Público presentó los testimonios de dos testigos de cargo; a saber, el propio perjudicado, el Policía Cordero, y el Sargento José H. Alvarado.

En lo pertinente, el testimonio del perjudicado, según se desprende de la Exposición Narrativa Estipulada de la Prueba, revela que el 3 de agosto de 2000, en horas del mediodía, viajaba de Guánica hacia Ponce por la Carr. Núm. 2. Declaró que en camino hacia el área, observó a través de la pantalla del radar de su patrulla la velocidad de los vehículos del frente y los que discurrían en la parte posterior. Relató que cuando cambió la antena del radar de atrás, notó en la pantalla un "*bonche*" de vehículos que venían de atrás. Describió que, entre esos había un vehículo haciendo corte entre los demás, transitando a unas 75 millas. Al pasar el vehículo de la señora Rivera, lo mandó a detener.

Declaró que se bajó de su patrulla y dijo: "*Buenas tardes, su licencia y la registración del vehículo*" y que la señora Rivera le respondió: "*Por qué carajo me paras, tú no sabes si yo tengo una nena enferma o la tengo en el hospital*". Declaró que luego él le dijo: "*Dama, su licencia y la registración del vehículo; la estoy deteniendo porque viene en la parte posterior de mí a 75 millas.*" Alegó que ella le contestó: "*Ah, yo sé quién es el jefe, el jefe suyo yo lo conozco. Ay, no te apures que yo te voy a acusar con él, allí nos vamos a ver*", a lo que él le dijo: "*Dama, está bien, no hay problema, su licencia y la registración del vehículo.*"

Continuó declarando que procedió a ocupar la licencia y la registración del vehículo, que expidió el boleto y que cuando le fue a entregar la libreta para que la firmara, ella le dijo: "*Hay (sic) y a qué velocidad usted venía, que yo venía a 75*", a lo cual él contestó: "*Mire dama, yo no, yo no venía a velocidad como usted lo estima. Yo vengo computando, vengo en control del tránsito e inclusive iba a investigar un accidente, que me llamaron que había un accidente de tránsito en el área de Tallaboa*", a lo que ella le preguntó: "*Ah, pero si usted iba a investigar un accidente, por qué me detiene*", y que él respondió: "*Porque usted viene a velocidad. Tenga la bondad y fírmeme aquí.*"

Continuó declarando que ella, al leer el boleto le dijo: "*Yo no tengo por qué firmarte eso*", a lo cual él respondió: "*No hay problema.*" Declaró que en la esquina de la libreta puso que se negó a firmar y le entregó su copia; se viró de espaldas y escuchó que ella le dijo: "*Ay, so pendejo, vete pa'l carajo*". Declaro que se viró y vio que ella arrancaba y se iba. Dijo que llamó entonces a su supervisor y le dejó saber lo que había sucedido. Su supervisor le dijo que fuera a investigar el accidente y luego fuera a la división para citar a la persona.

Declaró que llegó a Tallaboa y que no encontró el accidente, por lo que continuó hacia la división, y que llegando, lo llamó el Sargento Hernández de investigaciones administrativas indicando que había una dama

presentando una querella administrativa por una intervención y que iba a proceder. Le contestó que no había ningún problema y que hiciera la investigación que tuviera que hacer.

Así las cosas, se personó el Sargento Alvarado (su supervisor) y le preguntó por lo que había sucedido con la muchacha que le había dicho. Le contó y que éste le dijo que la muchacha estaba presentando una querella administrativa. Atestó que fue su supervisor quien le instruyó que llamara al Sargento Hernández para que citara a la persona a la división de tránsito para hablar con ella. Se alega que la señora Rivera compareció a la división porque el Sargento Hernández la citó y que su supervisor la entrevistó. Finalmente, declaró que se sintió mal por las expresiones porque no esperaba ese tipo de expresión de una dama y que él la había tratado con cautela y delicadeza.

Por su parte, el testimonio del Sargento José H. Alvarado, según se desprende de la Exposición Narrativa de la Prueba, en lo pertinente, revela que el 3 de agosto de 2000, era el supervisor del turno de 8:00 de la mañana a 4:00 de la tarde. Al regresar de unas gestiones en Mayagüez, el señor Cordero lo llamó por la radio y le dijo que tenía que hablar con él con relación a un incidente que había tenido en una intervención. Lo instruyó que fuera primero al accidente y luego a la División de Tránsito y que ahí se entrevistarían.

Continuó declarando que no le dijo por el radio la naturaleza del incidente. Atestó que las instrucciones, cuando algún miembro de la fuerza está envuelto en un accidente, o un incidente, son que sea el investigador quien investigue. Declaró que, dependiendo del caso que sea, el policía puede arrestar a la persona.

Declaró que con la señora Rivera habló el 3 de agosto de 2000 en la División de Tránsito como a la 1:00 o 2:00 de la tarde, que se entrevistó con ella y le explicó el porqué de la citación. Testificó que ella le admitió que tuvo un incidente con el señor Cordero y que estaba molesta porque el policía le había dado un boleto y ella no estaba conforme; que tenía coraje y que por eso había ido a presentar una querella ante el Sargento Hernández. Continuó declarando que no conocía los méritos de la querella y que nunca se había comunicado con el Sargento Hernández sobre ese caso. Declaró que la señora Rivera le dijo que el agente (señor Cordero) no le había faltado el respeto, ni dicho palabras obscenas. Declaró que procedió a indicarle que el señor Cordero alegaba que ella sí le había proferido palabras obscenas. Concluyó señalando que fue él quien instruyó al señor Cordero que llamara a Hernández para que la citara a la división de tránsito ese día.

Por su parte, la prueba de defensa consistió del testimonio del Sargento Hernández y de la señora Rivera.

El Sargento Hernández testificó que es agente del orden público, adscrito a la División de Investigaciones Administrativas del Area de Ponce. Su función es realizar investigaciones contra los compañeros de la fuerza, no la de decidir si los hechos conllevan investigación, toda vez que esa decisión recae sobre el Director de su Oficina. Declaró que para la fecha de los hechos, intervino en un caso donde la señora Rivera levantó una querella contra el Policía Cordero por la actitud que alegadamente éste había asumido al intervenir con ella. Surge de la declaración que la señora Rivera le señaló que cuestionó la detención y que se había negado a firmar el boleto. Asimismo, le comentó que cuando se le expidió el boleto, ella le manifestó que verificaría si era cierto lo del accidente en Tallaboa, ya que era él y no ella la que transitaba por la carretera a velocidad. Explicó que la señora Rivera había presentado la querella por la actitud asumida por el Policía Cordero durante la intervención. Por último, aclaró que investigó la intervención y no la alteración a la paz.

Por su parte, la señora Rivera testificó que el día de los hechos cuando transcurría por el municipio de Guayanilla, vio que transitaba un "*guardia*" al frente de ella rebasando entre vehículos de manera peligrosa, que luego se alejó bastante. El policía la detuvo y le pidió la licencia y el registro del vehículo. Indicó que el Policía Cordero le señaló que la había estado observando y que conducía a velocidad exagerada. Ella cuestionó la detención y le alegó que la velocidad que él llevaba era exagerada, ya que en todo momento iba guiando frente a ella. El agente le respondió que era excusable porque iba a cubrir un accidente en Tallaboa. Posterior a que terminara la detención, fue a Tallaboa y no vio ningún accidente. Declaró, y citamos *"[q]ue recordó lo sucedido*

*y la manera que el oficial conducía, decidió ir a la Comandancia a reportar lo ocurrido".* Una vez en el Cuartel explicó lo sucedido. Alegó se molestó cuando el Sargento Alvarado le señaló que el Policía Cordero planteaba que ella lo había mandado al carajo. Negó que dijera dichas palabras al Policía Cordero.

En su contrainterrogatorio indicó que había sido detenida en dos (2) ocasiones por conducir a exceso de velocidad. Argumentó que era el Policía Cordero quien iba a exceso de velocidad. Argumentó que la policía debía dar el ejemplo de no guiar a velocidad exagerada y que si hubiese tenido el biombo prendido, ella no le hubiera hecho preguntas. Reiteró, le molestó la actitud del Policía Cordero de no darle los buenos días, de decirle joven cuando ella es una señora, de sentirse intimidada por el tono de voz fuerte y agresivo. Explicó que cuestionó la detención porque ella iba conduciendo a 65 millas y no 75 millas por hora como dice el boleto.

Concurrimos con el Procurador General que el delito de alteración a la paz quedó configurado. Cuando la señora Rivera le profirió las frases mencionadas al Policía Cordero, su conducta y lenguaje, por su naturaleza propia, más de carácter de molestia, resultaron ser ofensivas e hirientes. El hecho de que el Policía Cordero no reaccionara de manera violenta, refleja lo bien entrenado que está para aceptar esa conducta. Prueba de que lo afectó, radica en que se comunicó con su Supervisor a fin de exponerle lo ocurrido. El autocontrol del Policía Cordero y el alto grado de tolerancia que demostró ante los hechos, evitó que la situación tomara otros matices.

La utilización de las palabras mencionadas por la señora Rivera, en la forma y contexto utilizadas, iban dirigidas a alterar la paz al Policía Cordero. El Tribunal Supremo ha resuelto que en el contexto en que dichas palabras son proferidas, las mismas incitan a riña. *Pueblo v. Caro González, supra.* Somos de opinión que las palabras utilizadas por la señora Rivera resultaron ofensivas, hirientes e irritantes, capaces de provocar la respuesta violenta de riña y, por consiguiente, la alteración a la paz. La conducta observada por la señora Rivera cae dentro del significado de conducta ofensiva, provocativa y de riña que penaliza el Art. 260, *supra.*

Por otro lado, la señora Rivera alega que la prueba de cargo no demostró que la paz del perjudicado fuere alterada, siendo éste el elemento esencial del delito. De las declaraciones de los testigos de cargo, surge que la única que inició o provocó el incidente con frases insultantes y ofensivas, fue la señora Rivera. Nada surge de la prueba ante nos que el incidente ocurrió por un acto de provocación por parte del policía, o que hubiera habido insultos de parte a parte. La prueba creída por el Tribunal de Primera Instancia fue la versión del Policía Cordero, quien declaró que la señora Rivera le había alterado la paz, al intervenir con ella ante la comisión de la infracción a la Ley Núm. 141, *supra.* Por otro lado, contrario a lo alegado, la prueba que desfiló y fue creída por el tribunal de instancia revela que, dentro de las circunstancias, el ambiente donde ocurrieron los hechos imputados a la señora Rivera, no era de intranquilidad. No obstante, entendemos que la señora Rivera alteró la paz del agente al proferirle los improperios injustificados.

La conducta del policía prueba la presencia del elemento básico, la paz, necesario para que se configure el delito imputado de alterar la paz. Es imprescindible armonizar toda la prueba y analizarla en conjunto, a los fines de arribar al peso que ha de concedérsele en su totalidad. *Pueblo v. De León Martínez,* 133 D.P.R. 746 (1993).

Por último, nos preocupa el planteamiento de la apelante en el sentido que, y citamos:

*"...día a día todos los empleados reciben palabras que molestan y enojan. Entiende que los agentes del orden público no son la excepción, toda vez que están expuestos a manifestaciones desagradables diariamente por la naturaleza de su empleo, pero lo que la sociedad espera de ellos, no son denuncias por manifestaciones de este tipo y sí que protejan el orden público. Plantea que los agentes del orden público no están para protegerse a sí mismos, sino para proteger a la ciudadanía. Entiende que no puede ver como protector del ciudadano a aquel agente que cada vez que se siente molesto promueve una denuncia para satisfacer sus sentimientos. Indica que no le gritó al Policía, ni causó tumultos, riñas o profirió amenazas, ni mucho menos calumnió, ridiculizó o difamó al Policía Cordero, actos incluidos en la palabra vituperios. Más aún, alega que*

*con la frase 'por qué carajo me paras' y 'so pendejo, vete al carajo'; no se puede concluir que estuviera desafiando al Policía Cordero o provocándolo."*

Un policía no viene obligado a tolerar de los ciudadanos insultos o provocaciones, como intenta alegar la señora Rivera. La policía es acreedora a la misma protección que otras personas. Si bien un policía está entrenado para afrontar situaciones difíciles, esto no significa que viene obligado a soportar insultos, falta de respeto, improperios o provocaciones de los ciudadanos. Negarle protección contra el insulto gratuito y obsceno a los policías, socavaría, no tan sólo, la dignidad y autoridad de dicho cargo, sino que devaluarían los principios constitucionales que promulgan la dignidad del ser humano y la igual protección de las leyes. *Pueblo v. Caro González, supra*. La Policía es acreedora a la misma protección que otras personas. Al asumir tan importante función, no renuncian a ese intangible -pero real-, elemento de honra. *Id.*

Por último, los planteamientos de la señora Rivera van dirigidos a cuestionar la determinación del tribunal de conceder entero crédito a la prueba de cargo.

Es principio cardinal que la apreciación de la prueba le corresponde al tribunal sentenciador y los tribunales apelativos sólo intervendrán con una determinación a esos efectos cuando se aporte evidencia de error manifiesto, pasión, prejuicio o parcialidad. *Pueblo v. Maisonave Rodríguez*, 129 D.P.R. 49 (1993). De ordinario, el tribunal de instancia está en mejor posición que un tribunal apelativo para aquilatar la prueba testifical porque pudo observar la manera en que los testigos se expresaron y su comportamiento en la silla testifical. *Pueblo v. Chévere Heredia*, 139 D.P.R. 1 (1995); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986).

No se intervendrá con la apreciación y adjudicación de credibilidad que en relación con la prueba testifical haya realizado el juzgador de los hechos en instancia, excepto en casos en que un análisis integral de dicha prueba cause insatisfacción o intranquilidad de conciencia tal que estremezca el sentido básico de justicia. *Pueblo v. Cabán Torres, supra.*

## V

Por los fundamentos que anteceden, se confirma la Sentencia recurrida. El Juez Ortiz Carrión concurre con el resultado sin opinión escrita. Así lo acordó y manda el Tribunal y lo certifica la señora Subsecretaria General.

Gladys E. Ortega Ramírez
Subsecretaria General

### ESCOLIOS 2001 DTA 160

1. 33 L.P.R.A. sec. 4521.

2. Conducir en exceso de velocidad.