EL PUEBLO DE PUERTO RICO, demandante y recurrido, *v.* DAVID FIGUEROA NAVARRO, acusado y peticionario.

*Número:* O-75-461      *Resuelto:* 31 de marzo de 1976

*Joaquín Monserrate Matienzo,* abogado del peticionario; *Miriam Naveira de Rodón, Procuradora General,* y *Candita R. Orlandi, Procuradora General Auxiliar,* abogadas del recurrido.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

El 19 de octubre de 1974 por encomienda de la Wackenhut Corp., el detective privado David Figueroa Navarro comenzó a investigar a Enrique Jordán Mussa. Su encomienda incluía observar sus actividades en el hogar y retratarlo si lo veía realizar labores que requirieran de algún esfuerzo físico. Esta información había sido solicitada por la parte demandada en un pleito de daños y perjuicios en el que Jordán alegaba haber sufrido daños ascendentes a $210,000.

Figueroa llegó a los alrededores de la calle Ter en Río Piedras Heights como a las diez de la mañana acompañado de su esposa. Llevó unos binoculares y una cámara con lente telescópico. Pasó lentamente con su auto varias veces mirando insistentemente hacia la casa de Jordán. Esto atemorizó a la señora Jordán quien se encontraba sola con sus hijos. En su declaración en el Tribunal de Distrito la Sra. Jordán vivamente relata: "que el día de los hechos . . . con la ayuda de la nena limpiaba la marquesina; que *pasó lentamente un carro, que pasó varias veces; que miraba la casa;* que anotó la tablilla del auto 70T130; que el color era anaranjado y capota negra; que la Calle Ter termina en la Calle Ural; identificando

al acusado, *declara que éste estacionó el carro, levantó el bo-nete y miraba insistentemente;* que movió el carro y se volvió a estacionar otra vez en la marginal; *que se preocupó por su esposo;* el cargo de éste [Fiscal Auxiliar]; que llamó a la Guardia Nacional; que al ir a llamar a su esposo *vio al acusado dar vuelta en la Calle Tinto, alinearse—estacionarse—sacar binoculares; que se puso intranquila;* que el acusado se bajó del carro; que su esposo llegó a la 1:30 de la tarde con un paquete; que mientras le explicaba a éste lo que estaba pasando [Figueroa] volvió a subir el carro, se estacionó en la Calle Tinto, que desde allí *el acusado sacó una cámara con lente largo y retrató a la nena;* que el acusado bajó por la Calle Ter y se estacionó tres casas al frente, sacó binoculares y empezó a mirar; que éste se enñangotó frente al carro al lado del guía y empezó a mirar con los binoculares; que no sabe la idea, *se intranquilizó; que el acusado escondió la cámara dentro del baúl del carro;* que levantaba el bonete todas las veces que se estacionaba." (Énfasis nuestro.) Pág. 5, Resolución del Tribunal de Distrito, Sala de Río Piedras, de 4 de abril de 1975.

Jordán salió de la casa y se dirigió hacia Figueroa. Figueroa le preguntó si él era Jordán. Después de contestarle en la afirmativa, Jordán le preguntó qué hacía allí. "[E]l acusado le contestó que no tenía que contestar esa pregunta y entonces le preguntó por la residencia de una familia amiga; que el acusado no le pudo decir el nombre ni apellido de dicha familia y contestó que no recordaba el nombre ni la dirección de ésta; que le preguntó porque atisbaba y retrataba su casa; que el acusado no contestó y le dijo que se estacionaba por-que el auto estaba dañado; que le mostró licencia de conducir provisional del Tribunal de Distrito de Carolina donde surgía que la residencia del acusado era Camuy; que le dijo que se marchara; que iba a dar parte a la policía, que viró la es-palda, que oyó ruido de bonete, que el carro se movió; que estaba alarmado, que por el trabajo que realiza, se le había

disparado a su auto, que temía el secuestro de sus hijas, esposa y daños a su persona; que para la fecha de los hechos estaba investigando un caso criminal complicado." Resolución, Tribunal Superior, Sala de Hato Rey, de 4 de septiembre de 1975, pág. 2.

El 9 de diciembre de 1974 se presentó denuncia contra Figueroa en el Tribunal de Distrito, Sala de Río Piedras por infracción al Art. 368 del anterior Código Penal (33 L.P.R.A. sec. 1439).[1] El Tribunal de Distrito, Sala de Río Piedras, Doris Figueroa, J. declaró al acusado culpable del delito de alteración a la paz y lo sentenció a pagar una multa de $200.00 más las costas. Inconforme con esta determinación el acusado apeló. Fue confirmada la sentencia. Acordamos revisar.

■ En Puerto Rico el derecho a disfrutar de tranquilidad en el hogar está consagrado en nuestra Constitución. Como expresamos en *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436 (1975):

"El derecho a la protección de la vida privada o familiar—el derecho a la intimidad—tiene un historial distinto en Puerto Rico a su evolución en Estados Unidos. Dicho derecho adquiere rango constitucional en Puerto Rico mucho más temprano que en la Unión Americana. La Constitución del Estado Libre Asociado de Puerto Rico dispone desde 1952 que 'Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar.' (Art. II, sec. 8). Esta disposición es una copia exacta del artículo V de la Declara-

---

[1] Así reza dicho artículo:

"§ 1439. *Perturbación de la paz*

Toda persona que maliciosa y voluntariamente perturbare la paz o tranquilidad de algún vecindario o individuo, con fuertes o inusitados gritos, conducta tumultuosa y ofensiva, o amenazas, vituperios, riñas, desafíos o provocaciones, o que en las calle de alguna ciudad o pueblo, o en las vías públicas disparare algún arma de fuego, o hiciere uso de lenguaje grosero, profano o indecoroso en presencia o al alcance del oído de mujeres o niños, en forma estrepitosa o inconveniente, incurrirá en delito menos grave y será castigada con multa máxima de doscientos dólares, o cárcel por un término máximo de noventa días o ambas penas, a discreción del tribunal. Código Penal, 1937, art. 368."

ción Americana de los Derechos y Deberes del Hombre, *La Nueva Constitución de Puerto Rico*, Ed. U.P.R. 1954, pág. 236, y entronca también con el artículo 12 de la Declaración Universal de los Derechos del Hombre, que dispone que:

'Nadie será objeto de ingerencia arbitraria en su vida privada, su familia, su domicilio o su correspondencia, ni de ataques a su honra o a su reputación. Toda persona tiene derecho a la protección de la ley contra tales ingerencias o ataques.' (Op. cit., 246.)

El reconocimiento del derecho a la intimidad en la Constitución de Puerto Rico obedeció básicamente a dos factores. Se estaba respondiendo, en primer término, a un concepto del individuo hondamente arraigado en nuestra cultura. Para un análisis detallado de las diferencias al respecto en los sistemas de valores de Latinoamérica y Estados Unidos, véanse: Wells, Henry, *La Modernización de Puerto Rico*, Ed. U.P.R. (traducción), 1972, pág. 21 *et seq.*; René de Visme Williamson, Culture and Policy; *The United States and the Hispanic World*, Univ. of Tenn. Press, 1949, pág. 9.

En segundo término, se quería formular una Carta de Derechos de factura más ancha que la tradicional, que recogiese el sentir común de culturas diversas sobre nuevas categorías de derechos. De ahí que la Declaración Universal de los Derechos del Hombre y la Declaración Americana de los Derechos y Deberes del Hombre ejerciesen una influencia tan significativa en la redacción de nuestra Carta de Derechos."

Aun en otras jurisdicciones donde no existe una disposición constitucional igual a la nuestra, se considera que "La paz pública es esa sensación de seguridad y tranquilidad, tan necesaria para nuestro bienestar que toda persona siente bajo la protección de la ley; y una alteración de la paz es una invasión a la protección que la ley así proporciona." *State* v. *Sanderson*, 185 A.2d 730, 731 (Vt. 1962). Así también se ha dicho que "El hogar de cada uno es como un castillo y fortaleza tanto para su defensa en contra de injurias y violencia como para su reposo . . . ." Semayne's Case, 77 Eng. Rep. 194, 195 (K.B. 1604) citado en Ervin, *Privacy and the Constitution*, 50 N.C.L. Rev. 1016 (1972).

Con lo expresado como trasfondo es inescapable concluir que la conducta del peticionario constituye una conducta ofensiva que perturbó la paz y tranquilidad de la familia Jordán. En *Ramos* v. *Tribunal de Distrito*, 73 D.P.R. 417 (1952) consideramos que constituía una infracción del Art. 368 el "*atisbar* por una de las ventanas de su residencia en momentos en que el perjudicado y su esposa se disponían a dormir, dando lugar de esta manera al aquí acusado, a que por su conducta completamente impropia y desordenada el Sr . . ., esposa y demás familiares se alarmaran."

█ La conducta del peticionario rondando la casa, deteniendo el vehículo al frente de la misma, mirando insistentemente, haciendo uso de binoculares y utilizando una cámara con lente largo y retratando a la niña constituye la conducta ofensiva que proscribía el Art. 363 del anterior Código Penal. Para realizar la investigación encomendádale el peticionario no tenía que actuar en la forma ostensible y atrevida en que lo hizo.

El caso en el que el peticionario basa mayormente su recurso, *People* v. *Weiler*, 71 N.E. 462 (1904), es distinguible al de autos. Allí el detective nunca advino en contacto directo con el investigado y éste no se dio cuenta de que lo seguían. De hecho, se enteró por un tercero. A ese efecto expresó el Tribunal:

". . . Realmente tan inofensivo fue el acusado que el querellante no se dio cuenta de que era seguido hasta que fue informado por otros, y, excepto por esta información, probablemente hubiese ignorado el hecho de que estaba siendo seguido por un detective." *People* v. *Weiler*, supra, pág. 402.

Es evidente que éstas no son las circunstancias que rodean el caso de autos. El detective aquí envuelto tuvo un contacto directo con el investigado y su familia.

█ Debemos tener en mente también el lugar de los hechos: los alrededores del hogar del perjudicado. Como hemos visto

uno de los derechos claves en nuestra Constitución es el derecho a la protección de la privacidad y la intimidad en el seno del hogar. *E.L.A.* v. *Hermandad de Empleados,* supra.

■ El hogar deja de ser refugio de paz y tranquilidad cuando sus moradores se ven envueltos en una investigación que palpablemente atenta contra su privacidad y hiere sus sentimientos angustiando al investigado y su familia. Las actuaciones de Figueroa constituyeron la conducta ofensiva que proscribía el Art. 368 del Código Penal. *Ramos* v. *Tribunal,* supra; *Pueblo* v. *Ways,* 29 D.P.R. 334 (1921).

*Se confirmará la sentencia que dictó el Tribunal Superior, Sala de San Juan (Hato Rey).*