EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br>    Recurrido<br><br>                  v.<br><br>Moraima Rodríguez Lugo<br>    Peticionaria | Certiorari<br><br>2002 TSPR 3<br><br>155 DPR _____ |

Número del Caso: CC-2000-869


Fecha: 9/enero/2002


Tribunal de Circuito de Apelaciones:
                    Circuito Regional IV


Panel integrado por su Presidenta, la Juez López Vilanova, y los Jueces
Córdova Arone y Escribano Medina


Abogada de la Parte Peticionaria:
                    Lcda. Clarisa Solá Gómez


Oficina del Procurador General:
                    Lcda. Yasmin Chaves Dávila



Materia: Art. 260 C.P.




        Este documento constituye un documento oficial del Tribunal
        Supremo que está sujeto a los cambios y correcciones del proceso
        de compilación y publicación oficial de las decisiones del
        Tribunal. Su distribución electrónica se hace como un servicio
        público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

        vs.                     CC-2000-869     Certiorari

Moraima Rodríguez Lugo

    Peticionaria

Opinión del Tribunal emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.

San Juan, Puerto Rico, a 9 de enero de 2002.

Tenemos la ocasión para determinar si tomar una fotografía a una persona sin su consentimiento constituye *per se* el delito de alteración a la paz configurado en el Art. 260 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4521; y para precisar lo que resolvimos antes en <u>Pueblo v. Figueroa Navarro</u>, 104 D.P.R. 721 (1976).

I

**El 4 de febrero de 1999, Dayanara Bracero Valentín (Dayanara) y Reyes García Díaz (García Díaz), ambos estudiantes de la Escuela David Antongiorgi de Sábana Grande, estaban** leyendo una

revista en la oficina de la escuela. **Estando allí sentados, junto con unos profesores y la directora de la escuela, entró la maestra de ciencias, Moraima Rodríguez Lugo (Rodríguez Lugo), y les tomó varias fotografías, sin su consentimiento. La directora de la escuela se molestó por lo acontecido y de inmediato le pidió a la maestra que le entregara la cámara con la que había tomado las fotos. Esta se negó a dársela. Así las cosas, más tarde ese día las madres de ambos estudiantes instaron una querella contra la maestra en la que alegaron que, de forma ilegal, voluntaria, maliciosa y criminalmente, la maestra había perturbado la paz y tranquilidad de los estudiantes, al tomarles unas fotografías sin su consentimiento, provocándoles temor.**

**El juicio se celebró el 30 de septiembre de 1999. Allí la estudiante Dayanara Bracero, de 14 años de edad, declaró que al ser fotografiada por la maestra se sintió nerviosa y preocupada porque desconocía por qué la maestra le había tomado las fotos y para qué las quería. Explicó que más tarde ese mismo día ella no pudo tomar un examen de ciencias que tenía porque seguía "nerviosa". El otro estudiante Reyes García, también de 14 años de edad, declaró que él no se había puesto nervioso, pero que sí se había sentido "mal" porque desconocía para qué la maestra quería esas fotografías.**

**Es menester señalar que, según surge de la transcripción de la prueba que obra en autos, la estudiante Dayanara también testificó que después de que le tomaron las fotos ella se había quedado "tranquila" en la oficina. A instancias del fiscal,**

sin embargo, Dayanara entonces reiteró que se había sentido "mal" y añadió que aún se sentía así porque "yo no soy figura pública pa' que ella me esté tirando retratos". La joven, en el contrainterrogatorio por la defensa, admitió que ella había tenido "problemas" con esa maestra desde agosto del año anterior, sin explicar en qué consistían tales "problemas". Sólo indicó que su madre había tenido un incidente anteriormente con la maestra, porque ésta le había exigido una carta escrita a la madre como requisito para que la maestra permitiera a Dayanara ir al baño cuando ésta quisiera. Además, Dayanara le explicó a la defensa que había declarado que después del incidente de las fotografías se había quedado "en el salón tranquila" porque sabía que cuando su madre llegara allí a buscarla, ella habría de resolver "ese problema".

Igualmente es menester señalar que en su declaración inicial, Reyes García testificó que él sí fue a tomar el examen de ciencias que Dayanara no tomó, porque él "estaba de lo más bien". Reyes García, al igual que Dayanara, señaló en el contrainterrogatorio que su malestar por el incidente de las fotografías surgía porque "nosotros no somos figuras públicas".

Reyes García también declaró que él sabía que la directora escolar tenía prohibido que los estudiantes acudiesen a la oficina de la escuela a menos que tuviesen alguna razón que lo justificase, como la de estar enfermos. La defensa le preguntó a Reyes García qué cómo él sabía de la prohibición referida y éste contestó que la propia directora lo había hecho

saber. La defensa entonces le preguntó a Reyes García si él y Dayanara no estaban violando la prohibición referida, y éste no le contestó. Antes, a preguntas del fiscal, Reyes García había declarado que él estaba en la oficina leyendo una revista, la cual él le había enseñado a Dayanara, quien entró a la oficina inicialmente "para botar una lata que ella tenía". Finalmente, como parte del contrainterrogatorio, Reyes García declaró que después del incidente de las fotos, la directora de la escuela se había reunido con su madre.

El único otro testigo de cargo fue el agente de la policía Edgardo Vega (Vega). En esencia, éste declaró que en el cuartel de la policía se habían recibido dos querellas contra la maestra, presentadas ambas por las madres de los dos estudiantes; que él había entrevistado a la directora de la escuela sobre el particular; que trató de entrevistar a la maestra en tres ocasiones sin lograrlo; que él estimaba que la maestra "se escondía"; que en vista de ello sometió el caso al tribunal sin ulterior investigación; que posteriormente fue a la escuela a citar a la maestra para el juicio; que la maestra estaba en un salón conduciendo una clase y no quiso atender al guardia escolar enviado por la directora de la escuela para que se ocupara de la citación; que entonces la propia directora acudió al salón de la maestra con el guardia escolar y con él (Vega) y ordenó a sacar a los estudiantes del salón; que la maestra se fue también y no quiso atenderlos; que él fue luego al tribunal y el juez expidió una orden de arresto. A preguntas de la defensa en el contrainterrogatorio, el agente Vega

admitió que no trató de citar a la maestra durante sus horas de oficina porque la directora de la escuela no le informó sobre tales horas de oficina.

Luego de escuchar la prueba de cargo, el Tribunal de Instancia encontró a la acusada culpable de los dos cargos de alteración a la paz imputados. Posteriormente, tras varios trámites procesales, se le impuso pagar una multa de $25 por cada delito.

Insatisfecha con la sentencia, Rodríguez Lugo recurrió al Tribunal de Circuito de Apelaciones. En lo pertinente aquí, la maestra alegó que el foro de instancia se había equivocado al amparar su dictamen en lo resuelto en Pueblo v. Figueroa Navarro, supra. Adujo la peticionaria que el Tribunal de Instancia emitió el fallo condenatorio por entender que en Pueblo v. Figueroa Navarro, supra, se había establecido jurisprudencialmente que tomar fotografías de otras personas sin su consentimiento constituía una alteración a la paz.

El foro apelativo confirmó el dictamen del foro de instancia el 16 de agosto de 2000. En esencia, resolvió el Tribunal de Circuito de Apelaciones que la actuación de Rodríguez Lugo había sido suficiente como para provocar irritación y para perturbar la tranquilidad de cualquier persona razonable en circunstancias similares. Indicó que la prueba de cargo había establecido que al momento del incidente, los estudiantes se encontraban en paz, mirando una revista en la oficina de la directora, y que fue precisamente la conducta de la peticionaria la que alteró a los estudiantes. Señaló

específicamente, que dicha actuación causó nerviosismo a Dayanara, quién no pudo tomar un examen que tenía más tarde ese día; y que cuando Rodríguez Lugo tomó las fotografías tenía la intención inequívoca de provocar, desafiar y alterar a Dayanara y a Reyes García.

Insatisfecha también con dicha determinación, Rodríguez Lugo recurrió ante nos, haciendo los siguientes señalamientos de error:

1. Erró el Tribunal de Circuito de Apelaciones al determinar que el planteamiento de insuficiencia de prueba en este caso se reduce a uno de credibilidad de testigos, por lo que, en ausencia de prejuicio, parcialidad o error manifiesto, no debe revocar al Tribunal de Instancia.

2. Erró el Tribunal de Circuito de Apelaciones al determinar que en este caso la prueba estableció que cuando la apelante tomó las fotos tenía la intención inequívoca de provocar, desafiar y alterar a la estudiante Dayanara y por consiguiente a Reyes.

El 8 de diciembre de 2000, expedimos el recurso de certiorari solicitado por la maestra, a fin de revisar la sentencia dictada por el foro apelativo el 16 de agosto de 2000. El 9 de febrero de 2001 accedimos a la petición de Rodríguez Lugo de aceptar como su alegato la solicitud de certiorari presentada ante nos. El Procurador General presentó su informe el 9 de marzo de 2001.

Pasamos a resolver.

## II

Como es sabido, el delito de alteración a la paz, según tipificado en el Art. 260 del Código Penal, 33 L.P.R.A. sec.

4521, se configura cuando una persona voluntariamente realizare cualquiera de los siguientes actos:

(a) Perturbare la paz o tranquilidad de algún individuo o vecindario, con fuertes e inusitados gritos, conducta tumultuosa u ofensiva o amenazas, vituperios, riñas, desafíos o provocaciones.

(b) Disparare en la calle o vía pública algún arma de fuego, o que sin ser un caso de legítima defensa, sacare o mostrare en presencia de dos o más personas algún arma mortífera, en actitud violenta, colérica o amenazadora o que de modo ilegal hiciere uso de dicha arma en alguna riña o pendencia.

(c) Hiciere uso de lenguaje grosero, profano o indecoroso en presencia o al alcance del oído de mujeres o niños, en forma estrepitosa o inconveniente.

Según surge claramente del texto del citado Art. 260, supra, el delito de alteración a la paz tiene varias modalidades. Una de ellas, configurada en el inciso (a) del Art. 260 referido, consiste del uso de palabras de riña ("fighting words") tan ofensivas que por el mero hecho de ser proferidas pueden causar que una persona de inteligencia común o de sensibilidad ordinaria pueda reaccionar violentamente en respuesta a que se las hayan proferido. Pueblo v. Caro González, 110 D.P.R. 518, 525 (1980).

Otra modalidad, configurada en el inciso (b) del citado Art. 260, consiste en sacar o mostrar una arma de fuego, sin ser un caso de legítima defensa, en presencia de dos o más personas con una actitud tan amenazadora que pueda producir en la persona amenazada el temor de que ha de ser agredida o de que va a sufrir daño. Pueblo v. Cardona, 63 D.P.R. 279, 280 (1944).

Una tercera modalidad, configurada en el inciso (c) del Art. 260 referido, consiste en utilizar lenguaje grosero, profano o indecoroso en presencia o al alcance del oído de mujeres o niños en forma estrepitosa o inconveniente. Pueblo v. Ruiz, 29 D.P.R. 74 (1921).

Una cuarta modalidad es la que aquí nos concierne. Esta se refiere no al uso del lenguaje proscrito aludido antes, sino a otros tipos de comportamientos ofensivos. En lo pertinente al caso de autos, se configura esta cuarta modalidad del delito de alteración a la paz cuando están presentes dos elementos, a saber: (1) que se haya desplegado alguna conducta ofensiva, o de provocación; y (2) que en efecto se haya perturbado la paz o la tranquilidad de algún individuo. Véase, Vizcarra Castellón v. El Pueblo, 92 D.P.R. 156, 167 (1965); Pueblo v. Medina, 58 D.P.R. 925, 926 (1941); y Pueblo v. Escobar, 36 D.P.R. 240, 241 (1927). La paz de algún individuo queda perturbada cuando la sensación de seguridad y tranquilidad que toda persona siente al amparo de la protección de la ley es invadida. Pueblo v. Figueroa Navarro, supra. Incluso hemos resuelto que cuando unos esposos se alarmaron porque un extraño se dedicaba a atisbar por una de las ventanas de su residencia en el momento que se disponían a dormir, en horas de la madrugada, ello constituye una "perturbación de la paz" de esos esposos. Ramos v. Tribunal de Distrito, 73 D.P.R. 417, 419 (1952). No es siempre necesario, pues, que la víctima del delito haya en efecto reaccionado con violencia para que se estime que se le perturbó la paz. Dependiendo de las

circunstancias, se puede estimar que quedó alterada la paz de una persona sólo cuando ésta justificadamente se ha sentido "alarmada" por un comportamiento claramente intrusivo de la intimidad del hogar. Pueblo v. Figueroa Navarro, supra, pág. 275; Ramos v. Tribunal de Distrito, supra.

La referida cuarta modalidad, que aquí nos concierne, presenta un problema similar al que identificamos en Pueblo v. Caro González, supra. A la luz de la redacción del estatuto sobre alteración a la paz y su desarrollo jurisprudencial, allí reconocimos la dificultad que existía entonces para determinar en qué medida el uso de un lenguaje indecoroso era lo suficientemente ofensivo o insultante como para constituir el delito de alteración a la paz. En la actualidad, fuera del contexto del uso de palabras ofensivas o vituperios, nuestra jurisprudencia es aun muy escasa en cuanto a ilustrar o definir qué tipo de acto o actividad es tan ofensivo o provocativo que constituye una alteración a la paz. Es claro ya que cuando se trata de palabras o vituperios, no basta que lo proferido tenga carácter de molestia. Pueblo v. Caro González, supra, a la pág. 530. No es suficiente, por ejemplo, que en medio de una huelga en que la Policía intentaba mantener el orden, una persona haya manifestado "esos policías son unos abusadores y unos charlatanes", aunque las palabras se hayan proferido "en un tono alto" por una persona que "estaba un poco excitada, algo violenta", si la persona se expresó en términos generales y no dirigidos exclusivamente a un policía. Pueblo v. Kortright, 70 D.P.R. 399 (1949). Tampoco basta que en una acalorada

discusión entre dos personas que habían sido amigos, uno le dijera al otro "tú no eres más que un huele bicho". **Pueblo v. Ruiz**, 29 D.P.R. 74 (1921). No basta el lenguaje indecoroso o grosero. **Id.** Para que puedan considerarse delictivas, las palabras proferidas deben ser "hirientes e irritantes, capaces de provocar una respuesta violenta". **Pueblo v. Caro González**, **supra**, a la pág. 530.

Por lo anterior, cuando no se trata de palabras, ¿cuán injuriosos deben ser los actos ofensivos para que puedan considerarse delictivos? Nos parece evidente que la respuesta a este interrogante debe ser la misma que adoptamos en **Pueblo v. Caro González**, **supra**, a la pág. 525, en relación al lenguaje ofensivo: que el acto ofensivo debe ser tan hiriente e irritante que pueda causar que una persona de sensibilidad ordinaria reaccione violentamente en respuesta a éste; es decir, que el acto sea tan ofensivo que pueda provocar a una persona común a reaccionar con violencia. A la luz del principio de legalidad que rige el derecho penal, es menester conceptualizar los actos ofensivos del mismo modo que hemos hecho con respecto al lenguaje ofensivo en vista de que ambas modalidades del delito surgen concretamente de una misma disposición estatutaria. En efecto, tanto el lenguaje ofensivo referido como los actos ofensivos en cuestión están proscritos por el mismo inciso (a) del referido Art. 260 del Código Penal. Darle estos dos tipos de conducta – lenguaje y actos – interpretaciones de diferente alcance no sólo significaría ignorar o desatender su común fuente en la misma ley escrita,

sino que además sería contrario a la larga tradición jurisprudencial conforme a la cual los estatutos penales deben ser interpretados restrictivamente, y en casos de dudas, a favor del acusado. Pacheco v. Vargas, Alcaide, 120 D.P.R. 404 (1988); Pueblo v. Tribunal Superior, 101 D.P.R. 439 (1973); Mari Brás v. Alcaide, 100 D.P.R. 506 (1972); Pueblo v. Mantilla, 71 D.P.R. 39 (1950); Pueblo v. Padilla, 20 D.P.R. 276 (1914); Pueblo v. Benítez, 16 D.P.R. 246 (1913).

Más aun, en los pocos casos en que expresamente hemos interpretado antes, qué constituye conducta "ofensiva", nos hemos referido indistintamente a actos o palabras, aunque la mar de las veces nuestra interpretación en éstos se dio en el contexto de un lenguaje ofensivo. En los casos referidos hemos indicado que la *conducta ofensiva* "consiste de actos, palabras..." que "injurian o hieren los sentimientos.. o provocan ira". Véase, Ramos v. Tribunal de Distrito, 73 D.P.R. 417 (1952); Pueblo v. Rivera, 48 D.P.R. 570 (1935); y Pueblo v. Ways, 29 D.P.R. 334 (1921). Nuestros propios precedentes, pues, nos compelen también a interpretar del mismo modo el acto ofensivo como la palabra ofensiva con respecto al elemento del delito que aquí nos concierne.

Finalmente, debe señalarse que la exigencia de que la conducta ofensiva, para que sea delictiva, debe ser tal que pueda provocar a una persona común a reaccionar con violencia está ampliamente reconocida en muchas otras jurisdicciones, incluyendo el estado de California, de donde provino inicialmente nuestra disposición sobre alteración a la paz.

Véase, <u>Ford v. City of Newport</u>, 474 SE 2d 848 (Va.1996); <u>State v. Woodworth</u>, 234 NW 2d 243 (ND 1975); <u>Kansas City v. Graham</u>, 502 SW 2d 411 (Mo 1973); <u>In re Buchman</u>, 463 P 2s 727 (Cal. 1970); <u>People v. Cohen</u>, 1 Cal. App. 3d 94 (Cal. 1969); <u>O'Leary v. Commonwealth</u>, 441 SW 2d 150 (Ky. 1969); <u>State v. Langston</u>, 11 SE 2d 1 (SC 1940); <u>Head v. State</u>, 96 SW 2d 981 (Tex. 1936); <u>People v. Anderson</u>, 1 P 2d 64 (Cal. 1931); <u>State v. Long</u>, 108 SE 279 (W.Va. 1921); <u>People v. Most</u>, 64 NE 175 (NY 1902). Una decisión del Tribunal Supremo de California indica con meridiana claridad el significado de "conducta ofensiva" que hemos estado examinando aquí:

> Section 415 is not unconstitutionally vague and overbroad. It has a commonly understood meaning that not only affords adequate notice of the type of conduct that is proscribed, but also precludes its application to conduct protected by the First Amendment. The part of the section under which petitioner was convicted provides: "Every person who maliciously and willfully disturbs the peace or quiet of any * * * person * * * by tumultuous or offensive conduct * * * is guilty of a misdemeanor." The terms "disturb the peace" and "breach of the peace," which are substantially synonymous, have long been understood to mean disruption of public order by acts that are themselves violent or that tend to incite others to violence. Thus, one may be guilty of disturbing the peace within that part of section 415 if he engages in "tumultuous" conduct, i. e., violent conduct that willfully and maliciously endangers public safety or order. <u>He may also be guilty of disturbing the peace through "offensive" conduct if by his actions he willfully and maliciously incites others to violence or engages in conduct likely to incite others to violence</u>. **<u>In re Buchman</u>, <u>supra</u>, a la pág. 730. (Enfasis suplido.)**

En resumen, pues, la "conducta ofensiva" que el inciso (a) del Art. 260 del Código Penal de Puerto Rico, <u>supra</u>, configura como una de las modalidades del delito de alteración a la paz es aquella que bien por palabras o por actos es tan hiriente e

irritante que puede causar que una persona de sensibilidad ordinaria reaccione con violencia a ella.

                              III

El Procurador General en su informe ante nos enfatiza que la actuación de la maestra, al tomar las fotografías en cuestión a los menores sin su consentimiento o el de sus padres, constituyó la "conducta ofensiva" que alteró la paz de los estudiantes Dayanara Bracero y Reyes García. Se apoya para su alegación en nuestra breve opinión en Pueblo v. Figueroa Navarro, supra. ¿Resuelve dicho caso lo que alega el Procurador General? Veamos.

En el caso referido, un detective privado había sido contratado por un demandado para investigar si el demandante realizaba labores que requerían de algún esfuerzo físico. Por ello, el detective llevó a cabo una vigilancia constante, visible y agresiva del hogar y la familia de la persona investigada. En varias ocasiones pasó lentamente frente a la casa del investigado. Luego se estacionó cerca de dicha casa, y mediante unos binoculares se dedicó a atisbar insistentemente hacia la casa del perjudicado. Más tarde sacó una cámara y retrató a una hija menor del investigado. Todo esto se realizó abiertamente y causó que la esposa del perjudicado, quien se había dado cuenta de lo que ocurría, se intranquilizara mucho. Posteriormente, el propio investigado encaró al detective y tuvieron un intercambio de palabras en un ambiente hostil. El investigado estaba muy alarmado porque

en su trabajo ya antes le habían disparado a su automóvil. Temía

el secuestro de sus hijas y de su esposa, y daños a su persona.

A la luz de estos hechos particulares, y luego de la

correspondiente denuncia, el detective fue encontrado

culpable del delito de alteración a la paz.

Al confirmar la convicción del detective, hicimos

hincapié en las circunstancias especiales de dicho caso. En

particular, le dimos una primordial importancia a la conducta

acometiva del detective y al hecho de que el detective había

lacerado la intimidad del hogar del investigado. Señalamos

allí lo siguiente.:

> La conducta del peticionario rondando la casa, deteniendo el vehículo al frente de la misma, mirando insistentemente, haciendo uso de binoculares y utilizando una cámara con lente largo y retratando a la niña constituye la conducta ofensiva que proscribía el Art. 363 del anterior Código Penal. Para realizar la investigación encomendádale el peticionario no tenía que actuar en la forma ostensible y atrevida en que lo hizo.

> El caso en el que el peticionario basa mayormente su recurso, People v. Weiler, 71 N.E. 462 (1904), es distinguible al de autos. Allí el detective nunca advino en contacto directo con el investigado y éste no se dio cuenta de que lo seguían. De hecho, se enteró por un tercero. A ese efecto expreso el Tribunal:

>> "...Realmente tan inofensivo fue el acusado que el querellante no se dio cuenta de que era seguido hasta que fue informado por otros, y, excepto por esta información, probablemente hubiese ignorado el hecho de que estaba siendo seguido por un detective." People v. Weiler, supra, pág. 402.

> Es evidente que éstas no son las circunstancias que rodean el caso de autos. El detective aquí envuelto tuvo un contacto directo con el investigado y su familia.

Debemos tener en mente también el lugar de los hechos: los alrededores del hogar del perjudicado. Como hemos visto uno de los derechos claves en nuestra Constitución es el derecho a la protección de la privacidad y la intimidad en el seno del hogar.

El hogar deja de ser refugio de paz y tranquilidad cuando sus moradores se ven envueltos en una investigación que palpablemente atenta contra su privacidad y hiere sus sentimientos angustiando al investigado y su familia. Las actuaciones de Figueroa constituyeron la conducta ofensiva que proscribía el Art. 368 del Código Penal. Pueblo v. Figueroa Navarro, supra, a las págs. 726-725.

**De lo anterior es evidente que en el referido caso no pautamos de modo alguno que sólo porque una persona le tome fotografías a un menor de edad sin su consentimiento o el de sus padres, se configura un acto delictivo de alteración a la paz. En Pueblo v. Figueroa Navarro, supra, lo decisivo no fue que el detective hubiese retratado a la niña** sino el cúmulo de circunstancias ofensivas y atemorizantes, sobre todo la invasión a la privacidad del hogar. **No tiene razón el Procurador General en su planteamiento, que convertiría el mero retratar involuntario de un menor, independientemente de las circunstancias, en una nueva modalidad del delito de alteración a la paz. Ello no surge de ningún modo claro y suficiente del texto del Art. 260 del Código Penal de Puerto Rico, supra, por lo que la contención del Procurador General no sólo rebasa por mucho lo que resolvimos en Pueblo v. Figueroa Navarro, supra, sino que es contraria también al principio de legalidad.**

**Para concluir esta parte del examen de la cuestión ante nos, debemos señalar, además, que la discusión en nuestra**

jurisprudencia sobre la violación al fundamental derecho a la intimidad que puede surgir por razón de la toma de fotografías involuntarias de una persona ha sido ocasionada por el hecho de la publicación no autorizada de tales fotografías. No ha sido el mero hecho de tomar las fotos lo que ha dado lugar a acciones civiles – no a denuncias penales – sino la publicación de éstas. Véase, Bonilla Medina v. P.N.P., 140 D.P.R. 294 (1996); y Colón v. Romero Barceló, 112 D.P.R. 573 (1982). Véase, además, Pérez Vda. De Muñiz v. Criado, res. el 19 de junio de 2000; 151 D.P.R. ____, 2000 TSPR 92, 2000 JTS 105. No hay nada, pues, en nuestra jurisprudencia que avale la contención del Procurador General.

### IV

A la luz de la normativa pertinente ya reseñada, pasemos ahora a resolver concretamente la controversia planteada en el caso de autos. A la luz de las circunstancias del caso, ¿fue la acción de la maestra, de tomarle fotografías a los dos estudiantes que estaban en la oficina de la escuela sin su consentimiento, tan ofensiva que constituyó el delito de alteración a la paz?

Con arreglo a la normativa reseñada antes, para que la acción en cuestión pueda considerarse criminal, deben estar presentes los dos elementos del delito en cuestión. El primero de estos elementos, que podría denominarse el elemento objetivo, es que la acción realizada sea ofensiva; es decir, que sea tan hiriente e irritante que pueda causar que una persona de sensibilidad ordinaria pueda reaccionar con

violencia al ser sometido a ella. **El mero acto de tomar una fotografía a una persona sin su consentimiento, sobre todo sin que dicha fotografía se haya revelado y divulgado,** de por sí y aisladamente **no puede constituir un acto criminal debido a que el Código Penal no lo establece así. Por razón del principio de legalidad, pues, tal acto sólo podría ser delictivo** si al tomar en cuenta todas las circunstancias en que dicho acto ocurrió, **resulta claro que se trató de una conducta ofensiva. En otras palabras, para que el acto en cuestión pueda considerarse penalmente ofensivo, es necesario examinar el contexto circunstancial en que ocurrió para así poder apreciar si cualquier persona de sensibilidad ordinaria hubiese sido capaz de reaccionar con violencia, de encontrarse que fue retratado sin su consentimiento** en tal contexto circunstancial. **Tal no es la situación en el caso de autos.**

**Nótese, en primer lugar, que el expediente del caso de autos está huérfano de prueba en cuanto a la motivación que tuvo la maestra para tomar las fotografías en cuestión. El motivo de la maestra era pertinente aquí para esclarecer si ella tenía algún** encono **particular contra Dayanara Bracero y Reyes García, de modo tal que quisiera provocarlos fotografiándolos. Debe recordarse que las fotografías se tomaron en una oficina escolar en la cual se encontraban varios otros maestros y la propia directora de la escuela. Fue un acto público, que la maestra llevó a cabo silenciosamente. Esta no emitió grito alguno; no profirió vituperio o amenaza alguna; no se comportó de modo tumultuoso. No cabe duda de que su acción**

**fue** impropia, **pero ello de por sí no la convierte en** delictiva. **En vista de lo anterior, para poder evaluar si la actuación de la maestra constituyó objetivamente una** conducta ofensiva, **hubiese sido pertinente conocer si la maestra, por alguna animosidad contra estos dos estudiantes en particular, tuvo la intención de hostigarlos mediante la toma de las fotografías. No se sabe si esa fue su intención.[1] No hay prueba alguna de ello.**

**Tampoco hay nada suficiente en el expediente sobre la relación anterior de la maestra con los dos estudiantes fotografiados. No hay absolutamente nada sobre la relación previa de la maestra con Reyes García. Con respecto a Dayanara, sólo surge que ésta había tenido algún problema con la maestra en relación al permiso de ir al baño en horas de clase. No hay base alguna, pues, para inferir que los estudiantes tenían ya tal temor o resentimiento hacia la maestra como para que la toma de sus fotografías constituyeran una provocación.**

**En resumen, pues, no se establecieron en el caso de autos circunstancias tales que permitan apreciar si una persona de sensibilidad ordinaria – en este caso algún adolescente común – pudo haber reaccionado** en tales circunstancias **de modo violento al ser fotografiado sin su consentimiento. No se estableció el elemento objetivo del delito en cuestión.**

---

[1] La peticionaria ha alegado ante nos que las fotografía iban dirigidas a probar que la directora de la escuela permitía a algunos estudiantes estar libremente en la oficina de la escuela cuando a los hijos de la maestra se lo había prohibido

**V**

El segundo elemento de la modalidad de alteración a la paz que aquí nos concierne es el que podría denominarse el elemento subjetivo; **es decir, que** en efecto **se haya perturbado la paz de la alegada víctima del delito. En el caso de autos, Reyes García testificó que se había sentido "mal" por haber sido fotografiado sin su consentimiento. Dayanara, por su parte, primero testificó que se había sentido "nerviosa", luego dijo que estaba "tranquila" y finalmente aclaró que se sintió "mal".**

**Las propias declaraciones referidas de los estudiantes levantan serias dudas sobre si existió aquí el segundo elemento requerido para que se haya configurado una alteración a la paz. Según hemos resuelto antes, para que se haya alterado la paz de alguna persona, es necesario que ésta haya sentido bastante más que un mero** malestar **por la conducta en su contra.** <u>Pueblo v. Caro González</u>, <u>supra</u>, **a la pág. 525. La persona debe haber reaccionado con violencia, o al menos haber sufrido una grave alarma e intranquilidad. En el caso de autos, sólo se estableció claramente que los estudiantes se sintieron "mal", lo que no sería suficiente para concluir que su paz fue en efecto alterada. Más aun, sus testimonios sobre el particular fueron tan estereotipados – se sintieron mal porque no eran figuras públicas – que luego de examinar cuidadosamente la transcripción de la prueba que obra en autos, no podemos concluir que se demostró la existencia de este segundo elemento**

discriminatoriamente. No podemos tomar esta alegación en cuenta

del delito más allá de toda duda razonable. Nos queda insatisfacción que perturba nuestro sentido de justicia. **Pueblo v. De León Martínez**, 132 D.P.R. 746 (1993); **Pueblo v. Rivero**, 121 D.P.R. 454 (1988); **Pueblo v. Caban Torres**, 117 D.P.R. 645 (1986).

**IV**

Por las razones expuestas, se dictará sentencia para revocar los dictámenes del foro apelativo y del foro de instancia en el caso de autos; y para ordenar la absolución de Moraima Rodríguez Lugo de los cargos por alteración a la paz en cuestión.

**JAIME B. FUSTER BERLINGERI**
**JUEZ ASOCIADO**

---

debido a que no se pasó prueba sobre ello en el foro de instancia.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Recurrido


      vs.                           CC-2000-869      Certiorari


Moraima Rodríguez Lugo

    Peticionaria


SENTENCIA


San Juan, Puerto Rico, a 9 de enero de 2002.


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente, se dicta sentencia para revocar los dictámenes del Tribunal de Circuito de Apelaciones, Región IV Aguadilla-Mayagüez, y del Tribunal de Primera Instancia, Subsección de Distrito, Sala de San Germán, en el caso de autos; y se ordena la absolución de Moraima Rodríguez Lugo de los cargos por alteración a la paz en cuestión.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señores Hernández Denton, Corrada del Río y Rivera Pérez concurren sin opinión escrita.

                            Carmen E. Rivera Cruz
               Secretaria del Tribunal Supremo Interina